## TRAILMOBILE COMPANY ET AL. *v.* WHIRLS.

No. 85.   Argued December 19, 1946.—Decided April 14, 1947.

*Philip J. Schneider* argued the cause for the Trailmobile Company, petitioner.   With him on the brief was *Morison R. Waite.*

*Sol Goodman* and *Ernest Goodman* argued the cause and filed a brief for the International Union, United Automobile, Aircraft & Agricultural Workers of America— C. I. O., Local No. 392, petitioner.

*Frederick Bernays Wiener* argued the cause for respondent. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, Paul A. Sweeney, Oscar H. Davis* and *Cecelia H. Goetz.*

*Frank L. Mulholland, Clarence M. Mulholland* and *Willard H. McEwen* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* urging reversal.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case, like *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. 275, presents a problem in the seniority standing of a reemployed veteran. It arises under § 8 of the Selective Training and Service Act of 1940.[1] The *Fishgold* case held that under the Act a veteran is entitled to be restored to his former position plus seniority which would have accumulated but for his induction into the armed forces.[2] Here the question concerns the duration of the veteran's restored statutory seniority standing. The petitioners maintain that it ends with the first year of his reemployment. Respondent's position is that it

[1] 54 Stat. 885, 50 U. S. C. App. § 301 *et seq.* In 1944 there was a minor modification of § 8 not here relevant. 58 Stat. 798; *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. 275, 278, note 1. As amended the Selective Training and Service Act expired in its major part March 31, 1947. Act of June 29, 1946, 60 Stat. 341. But § 8 is saved indefinitely.

[2] "He acquires not only the same seniority he had; his service in the armed services is counted as service in the plant so that he does not lose ground by reason of his absence." 328 U. S. 275, 285.

lasts as long as the employment continues.[3]    A suggestion has also been made that occurrences taking place since the decision in the Circuit Court of Appeals may have rendered the cause moot.

The case is an aftermath of a general controversy over seniority rights which arose among the employees of two corporations following their consolidation on January 1, 1944.    Because of the relation of the general controversy to this litigation a detailed statement of the facts becomes necessary.    Prior to their consolidation the Highland Body Manufacturing Company had been a wholly owned subsidiary of the petitioner, the Trailmobile Company. The two corporations manufactured the same commodities in separate plants in Cincinnati, Ohio.[4]    During 1943 under the plan of consolidation the supplies, equipment and personnel of Highland were transferred gradually to the plant of Trailmobile.    It took over the assets and business of Highland and assumed all its obligations.    The employees of Highland were transferred to the payroll of Trailmobile as of January 1, 1944, when the consolidation became fully effective.[5]

---

[3] Though the fact does not appear affirmatively in the record, the parties agree that Whirls upon his reemployment after his military service received in addition to the seniority he had acquired at the time of his entry into military service also seniority accrued during the period of his service, consistently with the standard of the *Fishgold* case.    This accorded with the then effective collective bargaining agreement which provided: "In case of a national crisis, such as a declared or undeclared war, any man who relinquishes his job with the Company for services rendered to the Government, shall on his return to work retain his place on the seniority list with accumulation."

[4] See 51 N. L. R. B. 1106, 1107, for details of the companies' operations.

[5] In the last full year of independent operation, 1942, Highland had approximately 100 employees and produced commodities worth approximately $1,500,000 and Trailmobile had approximately 1,000 employees and produced commodities worth $12,000,000.

The employees of both companies had been affiliated with the American Federation of Labor. 51 N. L. R. B. 1106, 1108. At the time of the consolidation the Highland group, including respondent, claimed seniority with Trailmobile as of the dates of their employment by Highland. The former Trailmobile employees opposed this, maintaining that the Highland personnel should be considered as new employees of Trailmobile, with seniority dating only from January 1, 1944. This dispute was submitted to national representatives of the A. F. of L. They decided in favor of the Highland group.

The former Trailmobile employees were dissatisfied with this decision. They outnumbered the Highland claimants about ten to one. Accordingly, reorganizing as a unit of the Congress of Industrial Organizations, they requested recognition as the exclusive bargaining agent of Trailmobile's employees, including the Highland transferees. An election was held under the auspices of the National Labor Relations Board, in which the new C. I. O. local was chosen as bargaining representative for a unit composed of both groups.[6]

Trailmobile accordingly negotiated with the C. I. O. and in July, 1944, a collective bargaining agreement was concluded, effective as of June 21, 1944. It provided that the seniority rights of former Highland employees should be fixed as of January 1, 1944, regardless of the dates of their original employment by Highland.

Respondent Whirls had been in Highland's employ from 1935 to 1942, when he entered military service. He was

---

[6] 51 N. L. R. B. 1106; 53 N. L. R. B. 1248. As the National Labor Relations Board determined that the appropriate bargaining unit was one composed of both Highland and Trailmobile employees, 51 N. L. R. B. at 1113, the ex-Highland employees, of course, lost the election, since there were many more Trailmobile employees. See note 5. The bargaining unit excluded supervisory and certain miscellaneous employees of both companies. 51 N. L. R. B. 1114–1115.

honorably discharged and returned to his work with Highland in May, 1943.[7]  He was thus among the employees transferred from Highland to Trailmobile as of January 1, 1944, whose seniority was reduced so as to start as of that date by the July, 1944, collective agreement with the C. I. O.

The Highland group contested the agreement's validity in the Ohio courts in a class suit brought July 17, 1944, by Hess, one of their number, on behalf of himself and 178 others similarly situated.  These included 104 persons actually at work, veterans and nonveterans, among whom was Whirls, and 74 employees then in the armed forces. The petition alleged that Trailmobile then had about 500 employees in military service, of whom apparently some 426 were outside the Highland group.

The theory of the class suit was that, although the plaintiffs were not then members of the C. I. O., the collective bargaining agent was the representative of all employees in the unit and hence could not legally deprive a minority of the employees which it represented of their accrued seniority and other rights by any collective agreement with the company.[8]  The petition alleged that the collective agreement arbitrarily and unlawfully deprived the plaintiffs of their "vested individual rights" and asked mandatory injunctive relief restoring each to seniority status as of the date of his employment by

---

[7] See note 3.

[8] There are holdings that, although a collective bargaining agent may by contract with the employer modify the seniority structure, it must act in good faith toward all employees.  See Seniority Rights in Labor Relations (1937) 47 Yale L. J. 73, 90; Christenson, Seniority Rights under Labor Union Working Agreements (1937) 11 Temp. L. Q. 355, 370–371.  The class suit was filed and determined before the decisions were rendered here in Steele v. Louisville & Nashville R. Co., 323 U. S. 192; Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U. S. 210; Wallace Corp. v. National Labor Relations Board, 323 U. S. 248.

Highland. The company and the collective agent stood upon the terms of the collective agreement and the agent's authority as certified representative to make it as justifying the action taken under it.

The Ohio courts held against the plaintiffs in the action, sustaining the position of the company and the union.[9] They held in effect that the seniority rights in issue arose exclusively from contract, making no reference whatever to § 8 of the Selective Training and Service Act or any question relating to it;[10] that the company and the collective representative were lawfully empowered to enter into the contract fixing those rights as of January 1, 1944; that the trial court was not authorized, in its own language, "to contract for the plaintiff[s] or make a new contract," since that power "exists only in the exclusive bargaining agent, under the provisions of the National Labor Act so long as that agent acts within the law."[11]

Accordingly the suit was dismissed. The record here does not disclose the date of the trial court's judgment. But its decision was affirmed by the Ohio Court of Appeals before October 2, 1945, when the union's answer was filed in the present cause; and the case had been finally determined against the plaintiff's claims by the Supreme Court of Ohio prior to October 15, 1945.[12]

The record is not entirely clear concerning the exact character and sequence of events between July 15, 1944,

---

[9] *Hess* v. *The Trailer Co.*, 31 O. O. 566, 17 O. Supp. 39, affirmed by the Court of Appeals, Hamilton County, Ohio, motion to certify record to the Ohio Supreme Court overruled, O. Law Rep., October 15, 1945, 51; 18 Ohio BAR 314.

[10] The pleadings in the class suit have been made part of the record in this case. Neither they nor the findings and judgment of the trial court in that cause disclose any reference to or consideration of § 8 or its possible effects upon that litigation.

[11] See note 8 *supra*.

[12] See note 9 *supra*.

when Whirls and other former Highland employees were notified that their seniority status would be changed, and September 18, 1945, when the present suit was filed in the District Court.   Apparently, after the notice was given, Selective Service officials intervened in behalf of Whirls and other veterans,[13] although his allegation that his seniority was restored as a result of that intervention was denied both by the company and by the union.   There is ambiguity also concerning whether the closed-shop provision appeared in the 1944 agreement or only in the 1945 one between the company and the C. I. O.   The facts of record, however, are more consistent with the view that it was not introduced until the latter year.

At any rate, in June or July, 1945, Whirls joined the C. I. O. union, thus complying with the closed-shop provisions of the collective agreement.   And until about September 3 of that year he continued to be employed in the painting department, where he had the highest seniority and was drawing pay of $1.05 per hour.   On or about that date, however, the company transferred him to the stock department, threatening to reduce his pay to $0.83 per hour and also to reduce his seniority rating in accordance with the collective agreement.

Whether or not the threatened reductions actually took effect is not clear from the record, for not long afterward Whirls was transferred again, to a position paying $1.18 per hour in another department.   But before this was done, represented by the United States

---

[13] Whirls' petition in this case alleged that after the notice of July 15, 1944, "defendant herein again restored plaintiff to his date of hiring, as regulating his seniority, to-wit: February 8, 1935, pursuant to a directive of the Selective Service System of the United States, and he continued to benefit by such seniority status until on or about September 3, 1945, at which time" the defendant transferred him as stated below in the text and threatened, unless restrained, to reduce his pay and seniority rating.

Attorney,[14] he brought this suit in the District Court under the Selective Training and Service Act. He sought to enjoin the threatened decrease in pay and change in seniority status. He also asked for restoration to his former position in the painting department and to his seniority as fixed by his original employment with Highland. The employer answered and the local C. I. O. union intervened in support of the employer's position. However, since Whirls had been transferred again before the case came on for hearing, the parties agreed at the hearing to limit the issues to those affecting the question of seniority. This was presented in two forms, (1) on the merits, the facts being substantially stipulated; (2) on the question whether the state court proceeding in the class suit had determined the seniority rights of Whirls, making the issue now raised *res judicata* for this suit. See *Angel* v. *Bullington,* 330 U. S. 183.

Taking respondent's view in both respects, the District Court rendered judgment in his favor. The Circuit Court of Appeals for the Sixth Circuit affirmed the District Court's judgment. 154 F. 2d 866. Besides holding *res judicata* inapplicable, both courts took the view, contrary to that later reached here in the *Fishgold* case, that the reemployed veteran was entitled to "superseniority" for one year following his reemployment,[15] and went on to hold that his statutory preferred status with respect to seniority and other incidents of his employment did not end with the expiration of that year. Because of the bear-

---

[14] Section 8 (e) of the Selective Training and Service Act, quoted in *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. at 280, note 3.

[15] The Court of Appeals expressly stated its disagreement with the views expressed by Judge Learned Hand, 154 F. 2d 785, writing for the majority of the Circuit Court of Appeals in the *Fishgold* case, the decision in which was affirmed here.

ing of the *Fishgold* decision upon the problem and the importance of the question presented, we granted certiorari. 328 U. S. 831.

## I.

At the outset it is important, in view of certain questions which have been injected beyond the issues presented for decision, to state explicitly what is not before us. In the first place, we are not required to determine whether the class suit in the state courts constituted an adjudication of the rights of the parties involved in this litigation. That question was presented to the District Court and the Circuit Court of Appeals. Both determined it adversely to petitioners, but no error was assigned to this ruling in the petition for certiorari. The question is therefore not before this Court and we express no opinion concerning it.

The view entertained in this respect by the District Court and the Circuit Court of Appeals, however, has assumed tangental bearing in connection with the suggestion that the cause may have become moot. In its memorandum filed upon the application for certiorari and in its brief, the Government calls attention to certain events not appearing of record but taking place after the decision of the Court of Appeals. Though suggesting the facts for our attention, the Government maintains that they do not render the controversy moot. This Court, of course, does not render advisory opinions. And since the suggestion of the facts not only is sufficient to raise the question of mootness but has injected others not comprehended in the issues, it is necessary to dispose of the matter before undertaking a determination of the question otherwise properly here for decision.

It is suggested and not denied that under date of April 10, 1946, respondent was notified by the collective agent that he had been charged with conduct unbecoming a

member of the union, namely, in bringing this suit without exhausting the remedies provided by its constitution and by-laws; in thereby violating the collective agreement; in negotiating with the employer through others than the union; and in conducting himself in a manner harmful to its interests and those of its members. Accordingly, on April 15, 1946, the union requested Trailmobile to suspend Whirls from work. In consequence, the company directed him not to report for duty. Since then, however, it has continued to keep him on the payroll, on leave of absence with full pay. Although the Government urges that Whirls thus continues in the company's employ and consequently the case is not moot, its suggestion of the facts has overlaid the only issue brought here by the petition for certiorari with questions of unlawful discrimination allegedly arising out of the suggested facts, under the decisions in *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen and Enginemen,* 323 U. S. 210; and *Wallace Corp.* v. *National Labor Relations Board,* 323 U. S. 248.[16]

The facts thus put forward have no proper bearing in this case otherwise than to suggest the question of mootness and to require that any decision which is made upon the merits here be made without prejudice to the future assertion of any rights of respondent which may have been violated by the conduct set forth. We agree that in the circumstances related he remains an employee of the company and the cause is not moot.

---

[16] The Government's brief puts the suggestion and discussion it makes as a matter of not desiring its "failure to explore the nature and causes" of the alleged discrimination to be taken "as an admission either" that there was not unfair discrimination under the *Steele, Tunstall* and *Wallace* cases, *supra;* or that such discrimination "cannot be redressed under Section 8 . . . after the lapse of the initial year of reemployment . . . ."

50

We also agree that the question of unlawful discrimination is not properly before us for decision.[17]  That question, insofar as it arose from events prior to this litigation, was involved in the Ohio class suit without reference, it would seem, to § 8 or its possible effects.  And because the petition for certiorari, as we have noted, assigned no error to the Court of Appeals' ruling on the issue of *res judicata* arising from the outcome of the class suit, we are not at liberty now to consider the effect of that litigation or the issues of discrimination embraced in it.  Insofar as any question of unlawful discrimination may be thought to arise from the facts said to have taken place after the decision of the Circuit Court of Appeals, we are also not free at this time to consider or determine such an issue.  As the brief of the Government in respondent's behalf pertinently states, "These points were not raised on respondent's behalf in the lower courts, and no evidence was introduced by any party on the issue of unfair discrimination.  Cf. *Hormel* v. *Helvering,* 312 U. S. 552, 556.  In view of that fact, and of the *Hess* litigation, we believe that it would be inappropriate, at this stage, to argue these issues."

Wholly aside from any question of power, this disclaimer on behalf of the party affected is a sufficient reason to justify refusal to inject such an issue here or to volunteer aid not sought.  We therefore are required to say no more concerning the matter now than that, if respondent has been unlawfully expelled, suspended or otherwise dealt with by the union for asserting his legal rights, the law has provided remedies for such injuries and they may be redressed in appropriate proceedings designed for that purpose upon proof of the facts constituting the wrong and due consideration of the legal issues they present.  To assure this possibility, however, the remand which be-

[17] See note 16.

comes necessary in this cause on the merits will be so framed as to preclude any foreclosure of such rights by possible future application of the doctrine of *res judicata* arising from this determination.

Since, moreover, in the view of the District Court and apparently of the Court of Appeals, the Ohio class suit was dispositive of issues of unlawful discrimination arising out of the facts presented in that litigation without reference to § 8,[18] it may be added that the Ohio determination could not apply, of course, to such discrimination taking place by virtue of later events.

We turn therefore to consideration of the sole question presented on the merits, namely, whether under § 8 the veteran's right to statutory seniority extends indefinitely beyond the expiration of the first year of his reemployment, being unaffected by that event as long as the employment itself continues.

## II.

The relevant portions of §§ 8 (a) and 8 (b) are set out in the margin.[19] But we are concerned particularly with § 8 (c), which reads:

"Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as naving been

---

[18] The Court of Appeals, noting that Whirls was not named as a party to the class suit other than as a member of the class, pointed out that numerous members of the armed forces were involved in both groups of employees, but that their interests as veterans under § 8 were not common to the nonveteran employees in either group. Hence, it concluded, the class suit was not appropriate for rendering a judgment binding upon veteran members of the complaining class as to the question of their seniority under § 8.   154 F. 2d 866, 872.

[19] "Sec. 8. (a) Any person inducted into the land or naval forces under this Act for training and service, who, in the judgment of those in authority over him, satisfactorily completes his period of training

on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration."

The Government argues on respondent's behalf that the correct meaning of § 8, and particularly of subsection (c), is that upon reemployment the veteran is entitled to retain indefinitely his prewar plus service-accumulated seniority.[20] Under the statute, it says, this seniority can-

and service under section 3 (b) shall be entitled to a certificate to that effect upon the completion of such period of training and service, which shall include a record of any special proficiency or merit attained. . . .

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from such training and service—

"(A) if such position was in the employ of the United States Government, its Territories or possessions, or the District of Columbia, such person shall be restored to such position or to a position of like seniority, status, and pay;

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; . . . ."

[20] The Government states that a veteran could be reduced in seniority on account of bona fide changed circumstances or on account of cause or upon waiver. As to this, see note 25.

not be taken away by a collective bargaining agreement or by the employer,[21] either during the year in which the statute insures the veteran against discharge without cause or thereafter while the employment continues.[22] Support for this view is thought to be derived from the syntax of the statutory language and from the legislative history.

It is argued that grammatically the "within one year" provision applies only to the last clause of subsection (c), relating to discharge without cause, and does not refer to the "other rights"[23] given by subsections (b) and (c), including restored statutory seniority. Because the "within one year" provision appears most proximately in connection with the prohibition against discharge, the Government seeks to give that prohibition, including its temporal term, effect as a command wholly distinct from

[21] Seniority arises only out of contract or statute. An employee has "no inherent right to seniority in service . . . ." *Ryan* v. *New York Central R. R.*, 267 Mich. 202, 208; *Casey* v. *Brotherhood*, 197 Minn. 189, 191–192. "The seniority principle is confined almost exclusively to unionized industry." Decisions (1946) 46 Col. L. Rev. 1030, 1031, and authorities cited. "In private employment seniority is typically created and delimited by a collective bargaining agreement . . . ." *Ibid.*

[22] See note 20.

[23] The Government's argument is limited to seniority. But it is equally applicable to the other components of "position," such as pay. Thus, if accepted, it would mean that after the guaranteed one year a veteran could be discharged but could not have his pay reduced.

The position to which an employee must be restored is either the position previously held or "a position of like seniority, status, and pay." See note 18. It is thus recognized that part of the restored "position" is the seniority accrued prior to service in the armed forces and, under the *Fishgold* case, during service. "Seniority" is part of "position," and therefore when the Act states in subsection (c) that the veteran may not be discharged "from such position" it means both from the job itself and from the seniority which is part of the job.

and unrelated to anything preceding. It treats the clause as a grammatically independent sentence and a substantively unrelated provision, although it is separated from the earlier ones only by a comma followed by the conjunction "and."

On this premise of complete severability the Government builds its entire case. The premise necessarily regards § 8 (c) as making no express provision for the duration of "other rights," but as leaving this to be found wholly by implication. The Government then goes on to conclude that the period to be implied is indefinite. Although the statutory security against discharge ends with the prescribed year, the protection given by § 8 (c) to "other rights" is said therefore not only to be effective for that year, *cf. Fishgold* v. *Sullivan Drydock & Repair Corp., supra,* but to continue in full force for as long as the job may last beyond that time. In this view, of course, the result would be to "freeze" the incidents of the employment indefinitely while "freezing" the right to the job itself for only one year.

Difficulties arise in connection with this construction, both in its premise and in its conclusions. One is that the conclusion of indefinite duration would not follow necessarily, if the premise of complete severability were acceptable. On that basis "indefinite duration" as the Government conceives it would not be the only tenable period or even the most probably contemplated one. Several alternatives would be presented. However, the statutory year would not be among them, since it is implicit in the premise of severability that the Act does not apply the concluding clause of § 8 (c) to "other rights" to secure their extension either during or after that time. On the other hand, the Government's view ignores the usual rule of construction where time is not expressly prescribed, but is evidently to be implied. For generally in such cases

duration for a reasonable period is the term accepted by the law rather than permanency or indefinite extension.[24] And this, in varying circumstances, might be found to be longer or shorter than the statutory year prescribed for the job itself.

The real trouble however is in the basic premise both grammatically and substantively. It assumes not only the complete independence of the last clause of § 8 from what precedes, but also that employment within the meaning of the Act is something wholly distinct and separate from its incidents, including seniority, rates of pay, etc. We think, however, that the idea of total severability is altogether untenable. To accept it would do violence both to the grammatical and to the substantive structure of the statute.

The clause is neither an independent sentence nor a disconnected prohibition without significant relationship to what precedes. "From such position" has no meaning severed from the prior language. The restoration provisions define the very character of the place not only to which the veteran must be restored but equally from which he is not to be discharged. Neither grammatically nor substantively could the discharge provision be given effect without reference to the prior "restoration" clauses. *Fishgold* v. *Sullivan Drydock & Repair Corp., supra.* Indeed such reference is explicit both in the phrase "from such position" and in the time provision itself, namely, "within one year *after such restoration.*"

To tear the concluding clause from its context is therefore impossible. It is conjunctive with all that precedes. Nor is it any the more permissible to disconnect its constituent temporal term. There can be no doubt whatever that Congress intended by § 8 (c) to secure the "other

---

[24] See, *e. g., Dillon* v. *Gloss,* 256 U. S. 368, 375; *Sunflower Oil Co.* v. *Wilson,* 142 U. S. 313, 322; 1 Williston, Contracts (Rev. ed.) 152.

rights" guaranteed by it for at least the minimum term of the prescribed one-year period. This indeed was a specific ruling of the *Fishgold* case.

The employee there had not been discharged in the sense of being thrown out of his job altogether. He simply had been deprived of the opportunity to work by the operation of the seniority system when there was not sufficient work for both himself and other employees with greater seniority after he had been accorded his full standing under the Act. That standing included not only his seniority status as of the time he entered the armed forces, but also all that would have accumulated had he remained at work until the date of his reemployment without going into the service. In the language of § 8 (c) he is to be "considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces." The Court held, indeed, that the Act did not give him standing to outrank nonveteran employees who had more than the amount of seniority to which he was entitled and to which he had been restored; in other words, that he was not given so-called "superseniority." But it also squarely held that he was given security not only against complete discharge, but also against demotion, for the statutory year. And demotion was held to mean impairment of "other rights," including his restored statutory seniority for that year. "If within the statutory period he is demoted, his status, which the Act was designed to protect, has been affected and the old employment relationship has been changed. He would then lose his old position and acquire an inferior one. He would within the meaning of § 8 (c) be 'discharged from such position.' " 328 U. S. at 286.

That § 8 (c) applies to secure the protection of "other rights" for at least the statutory year was therefore inherent in the rationalization of the *Fishgold* decision. To that extent at any rate the concluding clause was held

applicable, not severable, concerning them. This of course destroys the Government's basic premise of the complete severability of that clause and its resulting non-applicability to "other rights." While the reemployed veteran did not acquire "superseniority," § 8 (c) gave him the restored standing for the minimum duration of the prescribed year.

It is therefore clear that Congress did not confer the rights given as incidents of the restoration simply to leave the employer free to nullify them at will, once he had made it. Equally clearly Congress did not create them to be operative for the vaguely indefinite and variously applicable period of a reasonable time. But we cannot agree that they were given to last as long as the employment continues, unaffected by expiration of the one-year period.

To accept this conclusion, as we have said, would mean "freezing" the incidents of the employment indefinitely while "freezing" the right to employment itself for only one year. As long as the employee might remain in his job, his pay could not be reduced, his seniority could not be decreased, insurance and other benefits could not be adversely affected. And this would be true, although for valid reasons all of those rights could be changed to the disadvantage of nonveteran employees having equal or greater seniority and other rights than those of the veteran with restored statutory standing. The reemployed veteran thus not only would be restored to his job simply, as the *Fishgold* case required, "so that he does not lose ground by reason of his absence." 328 U. S. at 285. He would gain advantages beyond the statutory year over such non-veteran employees.

We do not think Congress had in mind such far-reaching consequences for the nation-wide system of employment, both public and private, when making the statutory provisions for the veteran's benefit. At the time it acted,

we had not declared war and the men who were called to service were being inducted for a year's training, with the idea if not the assurance that they would return to civilian life and occupations at the end of that year, without prejudice because of their service. Visionary as this notion proved to be, it hardly can be taken to support the view that Congress contemplated "freezing" the specified incidents of restored employment indefinitely.

The *Fishgold* case, it is true, concerned only events taking place within the statutory year. As the Court of Appeals pointed out in distinguishing this case, 154 F. 2d at 871, the issues there involved no question of the reemployed veteran's standing after the statutory year. But, as we have said, the decision did hold that § 8 (c) applies to "other rights" for the year. And the rationalization was wholly inconsistent with the idea that those restored rights continued indefinitely after the year, unaffected by its termination. The restored veteran, it was held, could not be disadvantaged by his service to the nation. He "was not to be penalized on his return by reason of his absence from his civilian job." 328 U. S. at 284. He was to be restored and kept, for the year at least, in the same situation as if he had not gone to war but had remained continuously employed or had been "on furlough or leave of absence." It is clear, of course, that this statutory addition to the veteran's seniority status is not automatically deducted from it at the end of his first year of reemployment. But the *Fishgold* decision also ruled expressly that he was not to gain advantage beyond such restoration, by virtue of the Act's provisions, so as to acquire "an increase in seniority over what he would have had if he had never entered the armed services. . . . No step-up or gain in priority can be fairly implied." 328 U. S. at 285–286.

For the statutory year indeed this meant that the restored rights could not be altered adversely by the usual

processes of collective bargaining or of the employer's administration of general business policy.[25] But if this extraordinary statutory security were to be extended beyond the statutory year, the restored veteran would acquire not simply equality with nonveteran employees having identical status as of the time he returned to work. He would acquire indefinite statutory priority over nonveteran employees, a preferred status which we think not only inharmonious with the basic *Fishgold* rationalization, but beyond the protection contemplated by Congress.

We are unable therefore to accept the Government's position. Aside from the events taking place after the Court of Appeals' decision, which as we have said are not properly here for consideration except upon the question of mootness, Whirls was treated exactly as were other employees in his group having the same seniority and status as he had on the date of his reemployment. There was no discrimination against him as a veteran or otherwise than as a member of that group. Both groups, the former Trailmobile employees and the former Highland employees, who composed his group, contained veterans and nonveterans in large numbers. Both contained veterans in active service and reemployed veterans when the collective agreement was made. Whirls was treated exactly as all other members of his group, the ex-Highland employees, veterans and nonveterans alike. Whether or not the collective agreement was valid, or infringed rights

---

[25] Section 8 (c), it will be recalled, forbids discharge "without cause within one year." It may be that the "without cause" qualification applies to "other rights" as well as to total discharge, more especially in view of the position we take concerning the severability of the concluding clause of § 8 (c). But no question is presented in this case whether the employer, for cause, could demote a reemployed veteran within the statutory year consistently with the requirements of § 8 (c), and we express no opinion in this respect.

of Whirls and other members of that group apart from rights given by § 8 (c), is not before us, for reasons we have stated. The only question here and the only one we decide is that § 8 (c), although giving the reemployed veteran a special statutory standing in relation to "other rights," as defined in the *Fishgold* case, during the statutory year, and creating to that extent a preference for him over nonveterans, did not extend that preference for a longer time.

On the facts therefore we are not required to determine the further question whether the statute would give protection to a reemployed veteran after the statutory year, if it were shown that he then had been demoted beneath his rightful standing under the Act as of the date of his restoration, though nonveteran employees having the same seniority standing as of that time had not been demoted or adversely affected. No such question is presented on the facts of record properly before us for consideration and decision. It will be time enough to consider such an issue whenever it may be presented.

We find it unnecessary therefore to pass upon petitioners' position in this case, namely, that all protection afforded by virtue of § 8 (c) terminates with the ending of the specified year. We hold only that so much of it ends then as would give the reemployed veteran a preferred standing over employees not veterans having identical seniority rights as of the time of his restoration. We expressly reserve decision upon whether the statutory security extends beyond the one-year period to secure the reemployed veteran against impairment in any respect of equality with such a fellow worker.

These reasons, founded in the literal construction of the statute and the policy clearly evident on its face, are sufficient for disposition of the case. They are not weakened by the Government's strained and unconvincing citation of the Act's legislative history.

That argument is grounded in conclusions drawn from changes made without explanation in committee with respect to various provisions finally taking form in § 8, changes affecting bills which eventually became the Selective Training and Service Act and the National Guard Act, 54 Stat. 858. Apart from the inconclusive character of the history, the Government's contention assumes that the only alternatives presented by the final form of the bill were indefinite duration for the incidents of the employment named and none at all. This ignores the other possibilities considered in this opinion, including duration for a reasonable time. Moreover, as has been noted, the most important committee changes relied upon were made without explanation.[26] The interpretation of statutes cannot safely be made to rest upon mute intermediate legislative maneuvers.[27]

The argument for respondent in this case is of whole cloth in principle with the contention for "superseniority" made and rejected in the *Fishgold* case, as indeed the District Court and the Court of Appeals regarded it. Lacking any better legislative footing, it equally cannot stand.

Accordingly the judgment of the Court of Appeals is reversed. This however will be without prejudice from the decision here to respondent's assertion in the future of any rights he may have against Trailmobile or the col-

---

[26] See S. Rep. 1987, 76th Cong., 3d Sess.; H. Rep. 2847, 76th Cong., 3d Sess.; H. Rep. 2874, 76th Cong., 3d Sess.

[27] The Government also relies upon certain statements taken out of context from the debates. "As is true with respect to all such materials, it is possible to extract particular segments from the immediate and total context and come out with road signs pointing in opposite directions." *Hust* v. *Moore-McCormack Lines*, 328 U. S. 707, 733. None of the selections is directed toward the question whether the veteran's seniority continues after the guaranteed one-year period so as to be not subject to modification by a collective bargaining agreement.

62

lective agent on account of their acts not presented on this record or involved in the issues determined by this decision.

*It is so ordered.*

Mr. Justice Jackson, with whom Mr. Justice Frankfurter joins, dissenting.

Of the millions of wage earners whom the War took from their jobs into the armed services, some came from organized industries, others from unorganized industries; some had priority rights incident to their jobs, others had no such rights. For all, Congress provided the security of being able to get back their old jobs for at least a year after their return to civil life. But since industrial priority rights usually prevailing in organized industry have important bearing both on permanence of employment and wages, Congress guaranteed the veteran not merely "against loss of position" but also against "loss of seniority by reason of his absence. He acquires not only the same seniority he had; his service in the armed services is counted as service in the plant so that he does not lose ground by reason of his absence." *Fishgold* v. *Sullivan Drydock & Repair Corp.,* 328 U. S. 275, 285. In brief, in employments that were governed by priority rights, absence in the armed services was treated as presence in the plant. The veteran acquired a rating which he would have had, had he not been away.

Congress thus dealt with two very different aspects of employment. It gave all wage earners the assurance of having their old jobs for a year. It further made imperative that wage earners who, by virtue of employment contracts, normally union contracts, had preferred positions should have the same preferred positions as those enjoyed by their fellows who had their status but remained behind. Congress limited the right to have a job to a year. But Congress, having assured a veteran the pri-

ority status he would have had had he remained at work, did not take away that status at the end of twelve months. Accordingly, because of the congressionally assured status, whereby a veteran had a priority right that he would have had, had he never left, he has whatever rights that status gave an employee under the general law of contract and more particularly, as in this case, under the National Labor Relations Act.

The veteran at the end of the year certainly is not in a worse position than he would have been had he not been in the armed services. If he could not be deprived of his seniority rights under the employment contract had he remained behind, he cannot be deprived of them because he is a veteran. Therefore, if under the National Labor Relations Act, those wielding the power of an exclusive bargaining agency on behalf of the veteran could not have discriminated against him had he not been a veteran, they cannot discriminate against him because he is a veteran. Any other result would fly so completely in the face of what Congress was about in fashioning economic security for the returning veterans, that it would require language totally wanting in what Congress wrote to find such a strange purpose on its part.

Congress did not authorize arbitrary reduction of the seniority rights to which the veteran had been restored at the end of the year. If his rights under the contract of employment assure that he will not be discharged before an employee with lower seniority and that he is entitled to a certain wage scale he continues in employment with this seniority status and is entitled to all its benefits, as long as others with lower seniority remain on the job.

In assuring not merely the retention of seniority status but its progression during the years in the service, Congress aimed to insure that the years which the veteran gave to his country should not retard his economic advancement. It is not likely that in furthering this policy

Congress would say that an employee, because he is a veteran, should suffer the consequences of having been to war after a year's return. The equality of treatment which Congress designed as between employees who went and employees who stayed could not be achieved by delaying for one year the disadvantages of having been away and then letting them affect the veteran.

Whirls came back from the army to his old work, where he had certain advantages of seniority. Now he has lost his seniority, and because he asked the courts to say whether he lost it legally he was booted out of his job and, moreover, was expelled from the union he had been compelled to join by reason of a closed-shop agreement. He may find other employment at his old craft closed to him. This is rather shocking and it is hard to believe that Whirls has no protection in law.

What happened to Whirls is this: The employer to whose service he returned was merged or consolidated with a bigger concern of the same kind—a corporation which had owned the company for which Whirls worked—and both businesses were continued under one ownership. This united the two working forces and the question arose as to relative seniority rights. Both groups had belonged to American Federation of Labor unions, so the problem was submitted to its national authorities. They ruled that each employee should retain seniority rights dating from the time he entered the employ of either company.

The bigger group revolted. They demanded their own seniority and demanded that the smaller group coming into the consolidation be treated as entirely new employees. They reorganized as a C. I. O. unit, demanded recognition as the exclusive bargaining agent of the whole enterprise and, of course, won the election. They then demanded and obtained a contract allowing their own seniority and establishing a closed shop. To keep his job at all, Whirls was obliged thereby to join the C. I. O. union

and, with others, suffered reduction of pay and loss of seniority rights.

Believing that he and others had been unlawfully dealt with and being supported by the Government in the belief, he sought a remedy in the courts. His claim was not frivolous, for two courts below granted him relief. But because he tested his rights in court, he was expelled from the union on charges that he negotiated for himself through others than the union and acted in a way contrary and harmful to its interests. Since he was no longer a member of the union, it demanded under the closed-shop agreement that the employer oust him from even the reduced job which its bargaining had left to him. The employer was obliged by its contract to comply but has been paying him on a leave-of-absence-with-pay basis. The short of it is that Whirls is out of seniority, out of work, and out of the union, with all that this means in a closed-shop industry. His predicament comes about not because of any fault of Whirls as a workman, nor because of his employer's wish.

The employer urges that we relieve it from the duty imposed by the court below of reinstating Whirls in his seniority rights because "the majority union members may compel the employer to discharge such returning veteran after the expiration of said one-year period. As in this case, the union might expel the veteran from the union, and thereby compel this employer to discharge such veteran under its closed shop contract with the union." One might have thought this an exaggerated fear conjured up in hostility to the union except that it is just what has happened, and that instead of repudiating it now the union endorses the threat. It says that the union "must do one of two things, (a) either discriminate against the Trailmobile veterans and allow the Highland veterans to supersede them on the seniority list, or, (b) in fairness to the Trailmobile veterans, negotiate for the discharge of High-

land veterans at the end of one year's guaranteed employment."

This combines a false alternative with a disingenuous threat. Both alternatives presuppose that the employer has an absolute right to discharge veterans after reemploying them for a year, whether or not they work under a contract which gives them seniority rights. But the question for decision is whether the veteran is secured in his seniority rights by the Act. If he is, he is to the extent of those rights under the employment contract entitled to his job even after the assured year has ended.

There is neither need nor authority to discriminate against any veteran of either plant. The fair solution would be that each employee go on the seniority list as of the date he entered either of the two units now consolidated. That was the solution under the collective agreement by which Whirls worked at the time of the consolidation. To thwart it, the whole machinery of the National Labor Relations Board was set in motion and apparently has been used in disregard of Whirls' rights under the Labor Act. Before we reach the question whether rights under the Labor Act have been infringed, however, it should be clear that the Selective Service Act secured Whirls' seniority rights, for it is those rights which he asserts were taken from him.

Section 8 (b) (B) refers to the job to which the veteran is entitled to be restored, *i. e.,* simply the same job which he left, or its equivalent. Section 8 (c) specifies what rights he shall have in that job. He is to have the seniority which would have accumulated while he was in service and he is to be assured against discharge for one year, regardless of what his or others' seniority rights are. Such assurance against discharge certainly does not terminate seniority rights after one year. Section 8 (b) (B) together with the provision against arbitrary discharge is enough to assure that the veteran will remain in the same

job for one year without diminution of its incidents. See *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275, 286, in which this Court said, "What it [Congress] undertook to do was to give the veteran protection within the framework of the seniority system plus a guarantee against demotion or termination of the employment relationship without cause for a year." 328 U. S. at 288.

That case interpreted the provisions against discharge as broad enough to prohibit also any reduction in status, pay, or seniority, during the year. But we did not hold that seniority rights ended with the year. Seniority rights are rights which, by their nature, endure as long as the employment does, and become more and more valuable in protecting that employment and enhancing its benefits. Ordinarily, one of their most important functions is to give a measure of security in the job. To have seniority rights for a year may not be an impossibility, but it is almost a contradiction in terms.

The job guaranteed against discharge for a year, then, is the job defined in § 8 (b) (B). But the right to discharge after the year is not unconditional where the employee is the beneficiary of a seniority plan. Of course, where employees have no seniority rights, the guarantee of one year's employment is their only right. But if a seniority system does exist, the Congress gave the employee "protection within the framework of the seniority system *plus* a guarantee against demotion or termination of the employment relationship without cause for a year." (Emphasis added.) *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. at 288.

It is to be noted that the seniority rights of Whirls were bargained away from him by a union which, under the National Labor Relations Act, was entitled to bargain as his representative. The Act makes the majority union "the exclusive representatives of all the employees in such unit" for bargaining. 49 Stat. 453, § 9 (a), 29 U. S. C.

§ 159 (a). We have held that this not only precludes the individual from being represented by others but also prevents him from bargaining for himself. *J. I. Case Co.* v. *National Labor Relations Board*, 321 U. S. 332. While the individual is thus placed wholly in the power of the union, it does not follow that union powers have no limit. Courts from time immemorial have held that those who undertake to act for others are held to good faith and fair dealing and may not favor themselves at the cost of those they have assumed to represent. The National Labor Relations Act, in authorizing union organizations "for the purpose of collective bargaining or other mutual aid or protection," 49 Stat. 452, § 7, 29 U. S. C. § 157, indicates no purpose to excuse unions from these wholesome principles of trusteeship.

We have held under a similar Act that the courts may intervene to prevent a majority union from negotiating a contract in favor of itself against a colored minority. Speaking for all but two members of the Court, Chief Justice Stone, after recognizing that the representatives may make "contracts which may have unfavorable effects on some of the members of the craft represented" in such matters as seniority, based on relevant differences of conditions, said: "Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences." *Steele* v. *Louisville & Nashville Railroad Co.*, 323 U. S. 192, 203. That opinion also declared that "It is a principle of general application that the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf, and

that such a grant of power will not be deemed to dispense with all duty toward those for whom it is exercised unless so expressed." 323 U. S. at 202. And in *Tunstall* v. *Brotherhood of Locomotive Firemen,* 323 U. S. 210, we held that where an individual is without available administrative remedies, the courts must grant him protection.

I do not think that Whirls' seniority rights after one year are made immutable or immune from collective bargaining. But the statute restored these rights to him as a veteran. They stand until they are lawfully modified. The record indicates that they have never been terminated or modified by good faith collective bargaining in the interests of the craft. It raises the suspicion that they were simply misappropriated to the benefit of the majority group which was under a duty to represent his interests as well as its own.

The courts cannot tolerate the expulsion of a member of a union, depriving him of his right to earn a living merely because he invokes the process of the courts to protect his rights—even if he does so mistakenly. The Labor Relations Act makes it an unfair labor practice by an employer "To discharge or otherwise discriminate against an employee because he has filed charges or given testimony" in proceedings under it. 49 Stat. 453, § 8, 29 U. S. C. § 158. Neither may a union use its own power over its members to by-pass the courts. *Cf. Dorchy* v. *Kansas,* 272 U. S. 306.

This action is equitable in character and equity traditionally adapts its remedies to the facts as developed by trial rather than to the form of pleadings. There could be no objection if the Court would remand the case for development of a more complete record. But I could not agree that it should be done with the suggestion that Whirls was not treated with discrimination because all in the Highland group were treated alike. If the Trailmobile Company had absorbed the wholly-owned Highland Company

before Whirls returned and used the consolidation as an excuse to deny Whirls reemployment rights, this Court would hardly have approved so transparent a scheme. The union has no more right to rely on the consolidation to justify deprivation of seniority rights.