**Boris THOMAS, Plaintiff,**

v.

**FORD MOTOR COMPANY, a Delaware Corporation, et al., Defendants.**

**Civ. A. Nos. 39879, 40129.**

United States District Court,
E. D. Michigan, S. D.

Nov. 8, 1973.

Theodore Weiswasser, Weiswasser & Barnard, Southfield, Mich., for plaintiff.

Joseph A. O'Reilly and James R. Jackson, Dearborn, Mich., for Ford Motor Co.

Jordan Rossen, Detroit, Mich., for UAW.

## MEMORANDUM OPINION

FEIKENS, District Judge.

Plaintiff sues Ford Motor Company, the International Union—UAW, and Local 600—UAW alleging racial discrimination, unfair representation, and violation of the collective bargaining agreement. Defendants move to dismiss, or in the alternative to strike certain demands in the complaint. Inasmuch as it has been necessary to go beyond the pleadings, the motion has been treated as one for summary judgment pursuant to Rule 56.[1]

### Background

The relevant events are essentially undisputed. In the spring of 1971 a blast furnace in the slab mill of the rolling mill in which plaintiff worked as an electrician was closed down for repairs. In preparation for the shutdown, officials of Ford and Local 600 met in late 1970 to make arrangements for layoffs and bumping rights. The resulting agreement, dated December 21, 1970, and two supplementary letters of understanding, dated February 16 and March 4, 1971, provided that approximately sixteen low seniority electricians in the rolling mill were to be temporarily laid off. Those with higher seniority were to exercise their seniority within the rolling mill so as to remain on the job during the shut-

---

1. "If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided iָ Rule 56 . . . ." Fed.R.Civ.P. 12(b).

Both sides have submitted a variety of documents, all of which have been read and considered for purposes of this motion, and both have been timely apprised of this court's intention to treat the motion as one for summary judgment. In addition, the union's motion to dismiss specifically requests the court to treat this as a motion for summary judgment should it become necessary to consider matters outside the pleadings.

down. Plaintiff was one of this latter group and was required to accept a lower incentive job assignment at the same time that the low seniority electricians were laid off. Once full operations were resumed, plaintiff found himself with insufficient seniority to bid back to his former high incentive position. The low seniority electricians, however, because they had been on layoff status, were permitted to resume work in their former high incentive jobs.

As was noted by the International Union's Public Review Board, in the course of considering plaintiff's appeal from the union's failure to prosecute his grievance, plaintiff "has displayed unusual energy and resourcefulness in attempting to right the wrong he believes he has suffered. He has written to Ralph Nader, filed charges with the NLRB,[2] appealed from the dismissal of those charges, complained to the Department of Labor and to the EEOC."[3] Except for having obtained a "right to sue" letter from the EEOC, he has been wholly unsuccessful in these efforts.

### Current Litigation

Having failed to obtain relief in any other forum, plaintiff instituted an action in this court (docket no. 39879) charging defendants with violating the terms of the Ford-UAW collective bargaining agreement. He later filed a second suit (no. 40129) alleging racial discrimination and breach of the duty of fair representation. All charges related to the events surrounding the furnace shutdown. The two actions were subsequently consolidated and have, for all practical purposes, been treated as a single case. The defendants' motions and this opinion are directed at all three of plaintiff's claims for relief. Singular

references, particularly those made to "the complaint," should be read accordingly. Likewise, although the International Union and Local 600 were individually named as defendants, their interests and the bases for their liability are virtually identical. They have, therefore, been considered as essentially a single entity, referred to simply as "the union".

Plaintiff advances three distinct theories of liability. He sues the company for breach of contract, claiming that the procedure whereby he was forced to continue working rather than being allowed to take a layoff was a violation of the collective bargaining agreement (Count I). He alleges a concomitant breach by the union of its duty of fair representation because of its participation in that arrangement, and (perhaps) because of its failure to prosecute plaintiff's grievance (Count II). Finally, plaintiff charges that the defendants conspired to discriminate against plaintiff and others in the company's hiring, promotional, and seniority systems in violation of Title VII of the 1964 Civil Rights Act,[4] 42 U.S.C. §§ 1981 and 1983, and the fourteenth amendment (Count III).

### Counts I and II

Although never specifically cited by plaintiff, it appears that the charges of breach of contract and unfair representation are brought under 29 U.S.C. § 185 (Section 301 of the Labor Management Relations Act of 1947). Defendants question plaintiff's right to sue under Section 301 on a variety of grounds.

■■■ 1. *Plaintiff's Right to Sue Under Section 301.* a. *Effect of NLRB Jurisdiction*—It is well established that actions under Section 301 are maintainable even where the subject matter would

2. In cases no. 7–CA–8722 and 7–CB–2404 the Regional Director refused to issue a complaint, and this decision was affirmed on appeal to the General Counsel. Two requests for reconsideration were subsequently denied. A complaint was not issued in case no. 7–CB–2420, but that decision was never appealed.

3. On March 2, 1973, plaintiff was issued a "right to sue" letter by the EEOC in cases no. TDT2–0049, TDT2–0050, and TDT2–0471. No other relief was granted.

4. 42 U.S.C. §§ 2000e to 2000e–15.

also be within the Board's jurisdiction over unfair labor practices. *Smith v. Evening News Ass'n*, 371 U.S. 195, 197, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Vaca v. Sipes*, 386 U.S. 171, 176–83, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). It follows that the exhaustion of remedies available from the NLRB is not a prerequisite to maintenance of this action. *See West Coast Tel. Co. v. Local 77, IBEW*, 431 F.2d 1219, 1222 (9th Cir. 1970). Conversely, neither does an unsuccessful exhaustion of those remedies necessarily bar relief under Section 301. The legal rights and liabilities at issue in a Section 301 suit are distinct from those involved in proceedings before the NLRB. Each represents a different cause of action, and a decision in one type of suit cannot constitute res judicata as to the other. An unfair labor practice may or may not be a contract or fair representation violation, and vice-versa. It is true that the doctrine of collateral estoppel might operate to foreclose further consideration of certain issues of fact (or of fact and law) once decided, regardless of the type of action involved. The conclusion of a regional director and the general counsel of the NLRB that a complaint should not issue is not, however, an adjudication of the sort which can give rise to such an estoppel. *Ruzicka v. General Motors Corp.*, 336 F.Supp. 824, 827 (E.D.Mich. 1972).

■ b. *Individual Employee's Right to Sue*—Individual employees may bring suit to vindicate rights conferred upon them by the collective bargaining agreement, *Smith v. Evening News Ass'n, supra*, 371 U.S. at 198–200, 83 S.Ct. 267, and for violations of the union's statutory duty of fair representation. *Vaca*

*v. Sipes, supra; Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

■ c. *Exhaustion of Contractual Remedies*—As a general rule, "individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965) (emphasis in original, footnote omitted). Such efforts are not required, however, if the parties did not intend the grievance and arbitration procedure to be the exclusive remedy under the contract,[5] or if the pursuit of such a remedy would be a futile act.[6]

■ Plaintiff's allegation in the complaint that he has exhausted his contractual remedies stands uncontradicted on this record. Plaintiff filed his own grievance after he was unable to persuade the union to do so on his behalf. That grievance was denied at the first stage, and the union refused to carry it any further. Plaintiff pursued his intra-union remedies in an attempt to reverse this decision, but was unsuccessful.

Article VII, Section 1 of the Ford-UAW collective bargaining agreement provides in part as follows:

"Except with respect to the right to present an individual grievance as expressly set forth in Section 2 of this Article, the Union shall, in the redress of alleged violations by the Company of this Agreement or any local or other agreement supplementary hereto, be the exclusive representative of the

---

6. "An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. . . . In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action." *Vaca v. Sipes*, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967).

interests of each employe or group of employes covered by this Agreement, and only the Union shall have the right to assert and press against the Company any claim, proceeding or action asserting a violation of this Agreement."

The right of an individual to present his own grievance provided for in Section 2 is limited to its initial submission to the foreman (first stage). After disallowance by the foreman, it may be prosecuted further only with union cooperation. That cooperation was denied plaintiff , by his committeeman, the Grievance Committee of the Local 600 General Council, the Local Executive Board, the General Council, the International Executive Board Appeals Committee, and the International Union's Public Review Board. Plaintiff's efforts to bring his case before the UAW Convention Appeals Committee were unsuccessful.

> "[A]nother situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance."

*Vaca v. Sipes,* 386 U.S. 171, 185, 87 S. Ct. 903, 914, 17 L.Ed.2d 842 (1967) (emphasis in original). Plaintiff meets this standard and is entitled to sue under Section 301.[7]

This conclusion is confirmed by another paragraph of Article VII, Section 1:

> "Any grievance that either (a) is not processed or (b) is disposed of in accordance with this Grievance Procedure shall be considered settled, and such settlement shall be final and binding upon the Company, the employe or employes involved, the Union and its members."

2. *Substance of Plaintiff's Claims Under Section 301.* a. *Union's Breach of the Duty of Fair Representation*—Although plaintiff is properly in court, there are serious doubts as to the viability of his claims under Section 301.

> "It is now well established that, as the exclusive bargaining representative of the employees in [a particular] bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining . . . and in its enforcement of the resulting collective bargaining agreement . . .. Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).

The employee's right to fair representation does not, however, include an absolute right to have his grievance taken to arbitration, even if it is ultimately shown to be meritorious.[8] If the union's conduct is not improperly motivated and is within the bounds of rationality, the fact that it may "unfairly" work a hardship on one employee is not enough to require condemnation.[9] The duty of fair representation is breached only when the union's conduct is "arbitrary, discriminatory, or in bad faith." [10] There must be "substantial

---

7. *See, e. g.,* Williams v. Dana Corp., 442 F. 2d 412 (6th Cir. 1971), in which the court held that a member of the UAW who alleged that the union had failed to press his grievance was not barred from suing under Section 301 by failure to exhaust his contractual remedies.

8. Vaca v. Sipes, 386 U.S. 171, 191–95, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967).

9. *Id.*

10. *Id.* at 190, 87 S.Ct. at 916.

evidence of fraud, deceitful action or dishonest conduct," [11] or of "discrimination that is intentional, severe, and unrelated to legitimate union objectives." [12] To insure that the salutary purposes of the pre-emption doctrine are not subverted by excluding unfair representation suits from its purview, the distinction "between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other, needs strictly to be maintained." [13]

■ The complaint charges that the union has acted "discriminatorily and arbitrarily" in adhering to "the unlawful and discriminatory practices and policies complained of herein." The rest of the complaint is not, however, very illuminating as to just what are the "practices and policies complained of," nor as to how they are *impermissibly* discriminatory. There is an explicit allegation of racial discrimination, but its viability is dependent on that of Count III.

The only other possibilities are personal animosity and nepotism. Although it appears that plaintiff did not get along well with certain local officials, this hardly accounts for the consistent rejection of his appeals at all levels of the union and by the Public Review Board (which has exclusively non-union members). In any event, personal frictions are not mentioned in the complaint, and this court is reluctant to imply them as a basis of plaintiff's case without more of a foundation than its own speculation.

Plaintiff has in the past been somewhat more explicit about the possibility that relatives of local officials received favored treatment by virtue of their membership in the group that was laid off. He does allege in the complaint that all sixteen of the employees placed on temporary layoff status were related to company and union officials, though he had previously been able to name only two who were so related. He has never been able to produce even a shred of evidence of any intent to discriminate in their favor, however, and his claim has been consistently rejected. It appears to a certainty that plaintiff cannot meet the evidentiary standard required for proof of unfair representation on grounds of nepotism. This count must therefore stand or fall upon his claims of racial discrimination.

■ b. *Violation by the Company of the Collective Bargaining Agreement* —Plaintiff alleges that the agreements of December 21, 1970, and of February 16 and March 4, 1971, and the procedures implemented pursuant thereto violated three provisions of the collective bargaining agreement: Article X, Section 9; Article X, Section 12; and Article VIII, Section 21. The first of these prohibits, *inter alia*, racially discriminatory application of the contract. Like the charges of unfair representation, this is dependent upon the viability of plaintiff's allegations of discrimination under Count III. The second provision merely states that the parties may not, in the guise of clarifying the language of the document, alter its substance. It is Article VIII, Section 21,[14] dealing

---

11. Humphrey v. Moore, 375 U.S. 335, 348, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964).

12. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed. 2d 473 (1971).

13. *Id.*, 91 S.Ct. at 1925.

14. Section 21. Temporary Layoffs
 (a) Definition and Applicability
  A temporary layoff, on model changes only, is defined as a layoff of not more than thirty (30) working days.

A temporary layoff for any other reason, is defined as a layoff of not more than twelve (12) working days.
The provisions covering temporary layoffs shall apply to all employes, both production and nonproduction employes, and the so-called "skilled plant-wide" classifications in the Rouge Area. The so-called "skilled plant-wide" classifications are not subject to the model change layoff provisions of this Agreement.
 (b) Right to Deviate from Seniority
  In the event of a temporary layoff, the

with the right to deviate from seniority in the event of a temporary layoff, which is the heart of Count II. I find, as a matter of law, that there was no violation of this section, and thus no cause of action thereunder.

Section 21 is applicable exclusively to "deviations from seniority" within the meaning of subsection (b) which occur during a "temporary layoff" within the meaning of subsection (a). It is only in those limited circumstances that the parties are required to follow the procedures outlined in Section 21. The arrangements of which plaintiff complains meet neither of the preconditions.

Subsection (a) defines a temporary layoff, for reasons other than model changes, as one not exceeding twelve working days. Plaintiff argues that because the reduction in force and layoffs in the slab mill lasted more than two months, local company and union officials were without power under Section 21 to approve of the arrangements actually made. The argument is technically correct, but proves merely that the section is irrelevant as applied to the events in question. It does not provide for any contingency other than "temporary layoffs," and by its terms therefore cannot operate as a restriction of any sort upon a layoff which because of its length was not "temporary".

Furthermore, it appears that there was no deviation from seniority such as is contemplated by Section 21. Subsection (b) states that "[i]n the event of a temporary layoff" the company may lay off employees as their work is completed, irrespective of their group seniority. However, there is absolutely no indication here that the layoffs were made according to work completed rather than by seniority. Indeed, plaintiff admits that the sixteen employees laid off were those with the lowest seniority, and that those who continued to work were those with highest seniority. It may be that under certain circumstances a higher seniority employee might have the right to choose a layoff in preference to a job transfer,[15] but no such circumstances are pleaded or argued by any party to this lawsuit, and will not be implied *sua sponte.*

■ Plaintiff seems not to realize that seniority *per se* confers no rights whatsoever on the employee. Higher seniority entitles him to priority in work related matters only to the extent that the collective bargaining agreement

Company shall have the right to lay off employes as their work is completed, irrespective of their group seniority; provided, however, that no other employe will be used on the jobs of employees who are temporarily laid off.
Upon resumption of work, employees shall be recalled as their jobs open up.
If necessary to retain some employees as members of a skeleton crew in a department during a temporary layoff, seniority employes will be used when practical.
(c) Discussions After 5 Days
   After five (5) days have elapsed following a temporary layoff, the Union shall meet with the Company to discuss the practicability of recalling seniority employes to replace junior employes for the remainder of such temporary layoff period; and where the Company agrees that it is practicable to do so, it will make such replacements.

(d) Local Negotiations
   Deviation from the terms of this Section may be made by agreement between local Management and the Unit affected for a particular temporary layoff. Any other agreement to deviate from this Section shall be subject to written approval of the National Ford Department of the Union and the Labor Relations Staff of the Company.
(e) Limitation on Use
   The temporary layoff provisions shall not be used for the purpose of avoiding seniority adjustments by scheduling a series of temporary layoffs to meet planned production needs.

15. *See, e. g.*, Article VIII, Section 16(b) of the Ford-UAW collective bargaining agreement, providing that an employee with ten years seniority who exhausts his seniority within the Unit may elect to take either available work or a layoff.

(or a statute) so provides.[16] It follows that there can be a "deviation" from seniority only when there is a derogation of privileges specifically accorded the worker in the collective bargaining agreement. The process of defining the scope of seniority rights under the contract merely delineates what may or may not be deviated from. In this the parties generally possess wide discretion.

"Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing promotions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338–39, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

Of course, once certain rights are established in a currently operative collective bargaining agreement, the parties may not, by supplementary agreements or otherwise, deny them to the individual worker-beneficiaries in contravention of that agreement.[17] Plaintiff does not cite any section of the Ford-UAW agreement which would give him the right to be laid off in the circumstances involved in the furnace shutdown. And from the fact that the company and the union felt it necessary to negotiate a special agreement covering the shutdown, it may be inferred that the collective bargaining agreement did not provide for such situations. Thus the agreement must properly be considered a definition of seniority rights (about which plaintiff cannot complain) rather than a deviation from previously vested rights.

### Count III—Racial Discrimination

There is no cause of action stated here under 42 U.S.C. § 1983. As an essential element of his claim for relief, plaintiff must allege that he was deprived of a constitutional right "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory."[18] Similarly, no suit can be maintained under the fourteenth amendment without an allegation of state action.[19] There is no such allegation in

16. *See, e. g.,* Trailmobile Co. v. Whirls, 331 U.S. 40, 53 n. 21, 67 S.Ct. 982, 91 L.Ed. 1328 (1947); Charland v. Norge Div., Borg-Warner Corp., 407 F.2d 1062, 1064–65 (6th Cir. 1969), *cert. denied,* 395 U.S. 927, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969); Local 1251, UAW v. Robertshaw Controls Co., 405 F.2d 29, 33 (2d Cir. 1968); Cortez v. Ford Motor Co., 349 Mich. 108, 112, 84 N.W.2d 523 (1957).

17. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 453–54, 77 S.Ct. 912, 1 L.Ed. 2d 972 (1957).

18. 42 U.S.C. § 1983 reads as follows:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

19. "Since the decision of this Court in the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the principle has become firmly imbedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."
Shelley v. Kraemer, 334 U.S. 1, 13, 68 S. Ct. 836, 842, 92 L.Ed. 1161 (1948) (footnote omitted).

the complaint, and even if there were it would not raise a genuine issue of fact.

Although a few courts have expressed the opinion that 42 U.S.C. § 1981 is also limited to acts engaged in under color of state law,[20] that position is no longer tenable in view of *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).[21] The applicability of Section 1981 to private acts of discrimination has been explicitly recognized since that case in at least five of the circuits.[22] A similar fate has befallen the argument that Title VII of the 1964 Civil Rights Act was intended to "preempt" Section 1981 as the exclusive remedy for discriminatory conduct.[23]

A more serious problem is posed for the plaintiff under both Title VII and Section 1981 by the fact that he complains of discrimination directed against blacks, but is himself white. It is conceivable that a white person might be incidentally injured by such discrimination. If he were a "person claiming to be aggrieved,"[24] or if he were denied the same rights as other "white citizens,"[25] as a result of racially moti-

20. *See, e. g.*, Smith v. North American Rockwell Corp., 50 F.R.D. 515, 518 (N.D.Okl. 1970); Colbert v. H–K Corp., 295 F.Supp. 1091, 1093 (N.D.Ga.1968); Waters v. Paschen Contractors, Inc., 227 F.Supp. 659, 660 (N.D.Ill.1964); Blocker v. Board of Education of Manhasset, New York, 226 F.Supp. 208, 227 (E.D.N.Y.1964).

21. In *Jones* the court held that 42 U.S.C. § 1982 applied to private as well as state action. The decision was based upon a construction of the Civil Rights Act of 1866, in which both Section 1981 and Section 1982 were enacted as parts of the same section (Section 1) of the Act (Act of April 9, 1866, c. 31, § 1, 14 Stat. 27). It is instructive to note that the court distinguished 42 U.S.C. § 1983 (which was enacted as Section 2 of the Act) based on its specific references to state action, references wholly absent from Section 1982. The wording of Section 1981 closely approximates that of Section 1982.

22. *See* Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476, 481–85 (7th Cir. 1970), *cert. denied*, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); Young v. International Telephone & Telegraph Co., 438 F.2d 757, 758–60 (3d Cir. 1971); Scott v. Young, 421 F.2d 143, 145 (4th Cir. 1970), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); Brady v. Bristol-Meyers, Inc., 459 F.2d 621, 622–23 (8th Cir. 1972); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097, 1099–1100 (5th Cir. 1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971).

23. *Compare* Smith v. North American Rockwell Corp., 50 F.R.D. 515, 518 (N.D.Okl. 1970), *with* Brady v. Bristol-Meyers, Inc., 459 F.2d 621, 622–24 (8th Cir. 1972).

24. 42 U.S.C. §§ 2000e–2(a) and (c) make it an unlawful employment practice for either an employer or a union to discriminate in any facet of the employment relationship on the basis of race. According to Section 2000e–5(b) and (f)(1) of Title VII, a complaint alleging an unfair labor practice may be filed with the EEOC, and later in federal court, by "a person claiming to be aggrieved." The statute nowhere requires the aggrieved party to have been the object of the conduct complained of, only that he claim to have been injured thereby. *Cf.* Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 715 (7th Cir. 1969); Hackett v. McGuire Brothers, Inc., 445 F.2d 442, 445 (3d Cir. 1971); Wilson v. Sibley Memorial Hospital, 340 F.Supp. 686, 687 (D.D.C.1972).

Although the requirement of standing serves to limit the sort of grievance which would be judicially cognizable, an "incidental" injury satisfies that requirement as well as the statutory language. "The use in 42 U.S.C. § 2000e–5 of the language 'a person claiming to be aggrieved' shows a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." Hackett v. McGuire Brothers, Inc., 445 F.2d 442, 446 (3d Cir. 1971). As to the elements of standing, *see* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

25. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

vated, proscribed conduct, he would have stated a cause of action under either statute.

█ It does not follow, however, that a white plaintiff is qualified under Rule 23(a) [26] to bring a class action in behalf of the blacks he claims were discriminated against. Plaintiff's deliberately vague pleadings make it highly uncertain just how large the class subjected to the claimed discrimination really is. If it consists only of a few electricians in the rolling mill,[27] it is not sufficiently large to make joinder impractical. If the class is any larger than this,[28] there is serious doubt as to whether there remain any questions of law or fact common to all of them. Certainly plaintiff's claims would not be typical of the claims which might be raised by a larger class, particularly one which is by his own admission almost entirely black, and is the primary rather than incidental target of discrimination. This last factor also indicates the un-

likelihood that he would be able to fairly and adequately protect the interests of such a broad class.

Of course plaintiff may still maintain his individual claim if it is properly framed and supported by a modicum of evidence. After careful consideration I find that it is neither. The language of the complaint is vague, conclusory, and thoroughly disingenuous. Plaintiff complains about the arrangements made for the shutdown, but does not explain how the facially neutral criteria employed there were *in esse* racially discriminatory. His broad allegations of discrimination are nothing more than bald and unilluminating conclusions of law. It seems that great care was exercised to avoid revealing who, other than plaintiff, was disadvantaged; what acts, if any, demonstrated racial discrimination; and how those acts justify that inference. The vague suggestions and innuendo of the complaint are wholly unacceptable.

An even more extreme position than is adopted here has been taken in several cases where the statute was held applicable to discrimination *directed against* whites. *See* Carter v. Gallagher, 452 F.2d 315, 325 (8th Cir. 1971); Gannon v. Action, 303 F.Supp. 1240, 1244 (E.D.Mo.1969), *aff'd in part and rev'd in part on other grounds*, 450 F.2d 1227 (8th Cir. 1971); Central Presbyterian Church v. Black Liberation Front, 303 F. Supp. 894, 899 (E.D.Mo.1969); Kentucky v. Powers, 139 F. 452, (Cir.Ct.E.D.Ky.1905), *rev'd on other grounds*, 201 U.S. 1, 26 S.Ct. 386, 50 L.Ed. 633 (1905).

26. "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a).

27. In a letter to Leonard Woodcock dated July 29, 1971, plaintiff charges that "the entire agreement initiated by the Company and executed by Nick Nestico discriminates against five brother members of the Union . . . ."

28. According to the complaint:
"[T]he class which Plaintiff represents is composed of Negroes and others who have been employed, are employed or might be employed by Ford Motor Company, at its Rouge Plant Steel Division in Dearborn, Michigan, and who were, are or might become members of International Union, UAW, a union organization, and Local 600, UAW, a union organization, who have been and continue to be or might be adversely affected by the practices complained of herein."

Among the practices complained of are:
"Discrimination against Plaintiff and other employees because of race or color and without respect to compensation terms, conditions, seniority, job status, and privileges of employment, said Plaintiff and other employees constituting a class composed almost entirely of Negro persons;" and

"Limiting, transferring, segregating, and classifying employees of the Ford Motor Company who are members of International Union, UAW, a union organization, and Local 600, UAW, a union organization in ways which deprive Plaintiff, Negroes and other persons in his class of equal employment opportunities and otherwise affect their status as employees because of race or color."

**63**

Furthermore, even if Count III were not on its face subject to dismissal, defendants would be entitled to a summary judgment. Plaintiff's pleadings are evasive for the simple reason that he lacks any evidence which would support a charge of racial discrimination. He feels aggrieved and has seized upon every conceivable basis in law for asserting his grievance, regardless of actual merit. The passionate and persistent assertion of a claim will not atone for its total lack of a factual foundation.

Falling with Count III are the remaining contract and fair representation claims which were also bottomed on the charges of racial discrimination. The remainder of defendants' arguments need not be considered. A summary judgment on all counts shall be entered in favor of defendants.

An appropriate order may be presented. .