**CONTINENTAL MOTEL BROKERS, INC., et al., Plaintiffs-Appellees,**

v.

**Bill B. BLANKENSHIP, et al., Defendants,**

**Arthur Fleck, Executor, Defendant-Appellant.**

No. 83–5187.

United States Court of Appeals, Sixth Circuit.

Argued May 2, 1984.

Decided July 20, 1984.

Rehearing and Rehearing En Banc Denied Nov. 5, 1984.

Charles S. Webb, III, New York City, Leo Bearman, Jr., argued, Memphis, Tenn., for defendant-appellant.

Grady F. Tollison, Jr., argued, S. Allan Alexander, Oxford, Miss., for plaintiffs-appellees.

Before KENNEDY and CONTIE, Circuit Judges, and JOINER, District Judge.*

CONTIE, Circuit Judge.

Edwin Fleck appeals from a district court judgment in favor of the plaintiffs in this action for wrongfully inducing the breach of a brokerage contract. Jurisdiction is based upon diversity of citizenship. The district court found damages in the amount of $333,450.00. This amount was trebled pursuant to Tenn.Code Ann. § 47–15–113 for a total damage award against Fleck of $1,000,350.00. For the reasons set forth below, we affirm the judgment of the district court.

* The Honorable Charles W. Joiner, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

## I.

In August 1979, Bill Blankenship controlled Nonconnah, Ltd., a limited partnership which was the record owner of the Memphis Airport Hilton Inn. At this time, Gene Higgins, an associate with the brokerage firm of Continental Motel Brokers, Inc. (Continental), asked Blankenship if he and his limited partners wished to sell the hotel. Blankenship responded affirmatively and orally entered into a brokerage contract with Continental. The parties agreed that Blankenship had the authority both to contract with Continental and ultimately to sell the hotel.

The contract provided that Continental should seek prospective buyers and that the price of the hotel would be $15,500,-000.00 of which $450,000.00 would constitute the brokerage fee. Since Blankenship was concerned about tax consequences, the contract further provided that no transaction involving the hotel would be final until approved by Blankenship's tax attorneys.

Continental subsequently retained Burrow, Viar & Walpole, a law firm specializing in hotel and motel sales. The law firm accepted a contingent fee arrangement through which it would receive fifty percent of Continental's brokerage fee.[1] Shortly thereafter, the Brokers contacted several potential purchasers, including New York hotel/motel owner Norman Groh. The Brokers expected that Groh would invite defendant Fleck or another New York investor to participate in the transaction. Fleck did in fact become involved in the purchase negotiations.

On January 18, 1980, Blankenship agreed to sell the hotel to Fleck and business entities controlled by him. This contract contained several conditions precedent, one of which was that Connecticut General Life Insurance Company, the first mortgagee on the hotel, must waive a "due-on-sale" clause contained in the mortgage. Although the parties believed that this waiver

would be forthcoming, and although good faith efforts were made to obtain the waiver, Connecticut General refused to waive the due-on-sale clause. The parties learned of this decision on April 25 or 26, 1980.

On May 1, 1980, the attorneys for Blankenship and Fleck initiated negotiations to restructure the transaction so that Connecticut General's approval would not be necessary. On June 26, 1980, a transaction was closed in which a Fleck-controlled entity named MKBE Associates, Ltd. (MKBE) purchased a forty-nine percent share in Nonconnah consisting of limited partnership interests. The deal also provided MKBE with an option to purchase an additional 25.1% interest in Nonconnah. MKBE later exercised this option. Finally, MKBE was afforded an option to purchase Blankenship's general partnership interest by 1995.[2] The parties agree that after this transaction closed, the Brokers were not paid the brokerage fee.

The Brokers subsequently filed suit in federal court seeking damages for constructive fraud, breach of contract and statutory and common law tortious interference with contractual relations. The district court, sitting without a jury, rejected the constructive fraud theory but held Blankenship liable for breaching the brokerage contract. Neither of these determinations is at issue on this appeal. The district court also held that during the negotiations preceding the closing of the June 26 transaction, Fleck had induced Blankenship to breach the brokerage contract. The court further found that the structure of the June 26 transaction indicated that Fleck had induced Blankenship to breach his contract with the Brokers. Accordingly, the court awarded treble damages to the plaintiffs pursuant to Tenn.Code Ann. § 47–15–113.

## II.

Appellant Fleck's arguments fall into two categories. First, he contends that the

---

1. The brokerage team of Continental and Burrow, Viar & Walpole will henceforth be referred to as the "Brokers."

2. MKBE's purchase of the interest in Nonconnah had to be staggered in order to avoid dissolution of Nonconnah.

district court erred both as a matter of fact and as a matter of law in finding that Fleck persuaded Blankenship to breach the brokerage contract. Second, he claims that even if the district court correctly found that Fleck persuaded Blankenship to breach the brokerage agreement, the court nevertheless erred in applying the treble damage provision of Tenn.Code Ann. § 47–15–113. Although the appellant has relied more heavily upon the latter claim, the logical progression of his arguments results in our considering the former category of claims first.

This case involves three contracts: (1) the August 1979 oral brokerage agreement between Blankenship and Continental, (2) the January 18, 1980 agreement, subject to conditions precedent, between Blankenship and Fleck (and their various business entities) to sell the hotel and (3) the June 26, 1980 agreement between Blankenship and Fleck (and their business entities) involving the sale of limited partnership interests in the hotel. We emphasize, however, that the only issue on this appeal is whether the appellant may be required to pay treble damages for inducing Blankenship to breach the August 1979 contract. We do not interpret or construe the other agreements.

Although the August 1979 brokerage contract between Blankenship and Continental was oral, the Tennessee courts will enforce such agreements. *See Alexander v. C.C. Powell Realty Co., Inc.,* 535 S.W.2d 154, 157–58 (Tenn.App.1975). Both Tennessee common law and § 47–15–113[3] prohibit persons from inducing parties to valid contracts to breach their contractual obligations. In order to recover under this theory, a plaintiff must establish seven elements:

1. There must be a legal contract;

2. The wrongdoer must have known of the existence of the contract;

3. The wrongdoer must have intended to induce its breach;

4. The wrongdoer must have acted maliciously;

5. The contract must have been breached;

6. The act complained of must have been the proximate cause of the breach; and

7. Damages must have resulted from the breach.

*See Edwards v. Travelers Insurance,* 563 F.2d 105, 120 (6th Cir.1977); *Dynamic Motel Management, Inc. v. Erwin,* 528 S.W.2d 819, 822 (Tenn.App.1975). Since the statutory claim is in the nature of a penalty, it, unlike the common law cause of action, requires a "clear showing" of the defendant's liability. *See Edwards,* 563 F.2d at 120; *Emmco Insurance Co. v. Beacon Mutual Indemnity Co.,* 204 Tenn. 540, 322 S.W.2d 226, 231 (1959); *Lichter v. Fulcher,* 22 Tenn.App. 670, 125 S.W.2d 501, 508 (1939). Once this showing is made, however, imposition of treble damages is mandatory. *See Edwards,* 563 F.2d at 120; *Howard v. Haven,* 198 Tenn. 572, 281 S.W.2d 480, 486 (1955).[4]

The district court applied the "clear showing" standard and held that the Brokers had proven all seven elements of their § 47–15–113 claim. On appeal, the appellant challenges only the district

---

**3.** Section 47–15–113 provides:

It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of said contract; and

the party injured by such breach may bring his suit for said breach and for such damages.

**4.** A plaintiff's right to recover treble damages "is in no way affected by the fact that the injured party also has a right of action in contract against the defaulting party to the contract." *Swift v. Beaty,* 39 Tenn.App. 292, 282 S.W.2d 655, 659 (1954). Thus, the Brokers were entitled to proceed against Fleck even though they also sued Blankenship.

court's finding of malice.[5] Since this was a factual finding, it may not be disturbed unless clearly erroneous. *See* Federal Rule of Civil Procedure 52(a). A factual finding is not clearly erroneous unless the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)); *Sawyer v. Arum*, 690 F.2d 590, 591–92 (6th Cir.1982). The record is to be viewed in the light most favorable to the appellees. *See Arum*, 690 F.2d at 592.

To support their claim that the district court clearly erred in finding malice, the appellants rely upon informal oral comments made by the district court after the close of the proofs. In these comments, the court stated that it did not "believe that Mr. Fleck fitted into the malicious category" but that "it might be persuaded otherwise." We hold that the appellant may not rely upon these informal comments for two reasons. First, the district court's statement clearly indicates that the court had not decided the malice issue in Fleck's favor. Secondly, and more importantly, the district court's informal comments were not part of the findings of fact and conclusions of law that were made pursuant to FRCP 52(a). Only the latters findings may be reviewed on appeal under the clearly erroneous standard.

■ Taking the record as a whole, we conclude that the district court's finding of malice was not clearly erroneous. The record indicates that Fleck wished to purchase the hotel and sell it at a substantial profit to a syndicate composed of investors seeking tax shelters. Fleck admitted that since he had already made arrangements with these investors, it was essential for him to "deliver" the hotel. Consequently, the district court was entitled to find that after the January 18 transaction fell through, "Fleck clearly had an intention to cause a breach of the brokerage contract if that is what it took to close the transaction."

That Fleck maliciously induced Blankenship to breach the brokerage contract is demonstrated by certain comments that he made between the failure of the January 18 transaction and the closing of the June 26 transaction. These statements evinced Fleck's attitude that the June 26 transaction should not provide for the Brokers' fee. In discussing matters with his attorney, for instance, Fleck stated, "f—k the brokers." Fleck further stated that if the Brokers tried to delay the closing in order to obtain their fee, he would attempt to ruin their reputations nationwide and to put them out of business. Moreover, Fleck directly told the Brokers during negotiations prior to the June 26 transaction that there was "no room in this deal" for them. Although Fleck denied making these statements, this court gives great weight to the district court's credibility determinations. *See Arum*, 690 F.2d at 592; *Barry v. United States*, 501 F.2d 578, 584 (6th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *Ramsey v. United Mine Workers*, 481 F.2d 742, 747 (6th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973). In light of Fleck's statements, we are compelled to hold that the district court's finding of malice was not clearly erroneous.

**5.** Since Fleck challenges only the finding of malice, any objections he may have had regarding the other six elements are waived. *See* Federal Rule of Appellate Procedure 28(a)(4); *Trailmobile Co. v. Whirls*, 331 U.S. 40, 48, 67 S.Ct. 982, 986, 91 L.Ed. 1328 (1947); *General Electric Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 727 (6th Cir.1962). *See, e.g., Kizzier Chevrolet Co., Inc. v. General Motors Corp.*, 705 F.2d 322, 325 n. 2 (8th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 153, 78 L.Ed.2d 141 (1983); *In re Municipal Bond Reporting Antitrust Litigation*, 672 F.2d 436, 439 n. 6 (5th Cir.1982); *Red v. Blackburn*, 636 F.2d 1027, 1028 (5th Cir.1981); *United States v. Bell*, 506 F.2d 207, 217 n. 61 (D.C.Cir.1974); *Larkin v. United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Industry*, 338 F.2d 335 (1st Cir.1964), *cert. denied*, 380 U.S. 975, 85 S.Ct. 1337, 14 L.Ed.2d 270 (1965).

Circumstantial evidence also supports the district court's finding. The appellant admits that the June 26 transaction was not structured to provide sufficient cash for Blankenship to pay the Brokers' fee. Furthermore, Fleck agreed to indemnify Blankenship for a portion of the Brokers' fee should Blankenship be held liable in court to pay such a fee. Numbered paragraph eight of the June 26 contract provided:

> Both parties recognize that certain parties (hereinafter called Brokers) assert a claim against Nonconnah, Ltd., Bill B. Blankenship and perhaps others arising from an alleged Brokers' Agreement for the sale of Nonconnah, Ltd. property. This claim is disputed and denied, but nevertheless constitutes a contingent liability. Seller agrees to indemnify and hold Buyer harmless for any loss incurred, including legal fees, in defending any legal suit or action brought by Brokers alleging a brokerage commission or similar type of compensation. In the event a court of competent jurisdiction renders a final judgment, that the Broker is entitled to such compensation, and all appellate processes have been exhausted, Seller will indemnify Buyer up to a maximum of Two Hundred Twenty-five Thousand ($225,000) Dollars for any such judgment. Any balance on such judgment in excess of $225,000.00 shall be shared 50% by Seller and 50% by Buyer, up to $450,000.00, unless and until Buyer exercises its option to purchase the Partnership Interests of the West Side Inn Group, Ltd., a limited partner in Nonconnah, Ltd. If and when Buyer exercises such option, Seller agrees to pay the first $328,500.00 of any such judgment and Seller and Buyer shall share 50% each any judgment in excess of $328,500.00 up to $450,000.00. [App. at 110.]

Although this language appears to state that Blankenship was indemnifying Fleck, it bears emphasis that only Blankenship was obligated to pay the brokerage fee under the August 1979 agreement. Consequently, to the extent that paragraph eight of the June 26 contract relieved Blankenship of part of this obligation, Fleck actually was indemnifying Blankenship. Although Fleck testified that it was Blankenship who demanded the indemnity clause as part of the consideration for closing the June 26 transaction, the district court obviously did not credit Fleck's testimony. In the context of the other evidence of malice, the district court was entitled to view the indemnification clause as evidence that Fleck was attempting to make breaching the brokerage contract more attractive to Blankenship.

Despite the Brokers' clear showing of all seven elements of their § 47-15-113 claim, Fleck argues in the alternative that he did not induce Blankenship to breach the brokerage agreement as a matter of law. The district court held, and the parties do not now dispute, that no brokerage fee was due the plaintiffs until the hotel was sold. Therefore, although the brokerage contract was the source of the plaintiffs' right to collect a fee, that right did not accrue until Fleck agreed to purchase the limited partnership interests on June 26, 1980.

Fleck contends that this scenario compares favorably to the facts of *Madden v. Shane,* 185 S.W. 908 (Tex.App.1916). Madden contracted with Shane, a broker, to sell the former's property. After Shane introduced Madden to prospective purchasers Thompson and Love, Madden allowed the brokerage contract to expire. Madden then deeded the property to Tuck, who in turn deeded it to Love. The court expressly found that the deed to Tuck was a sham transaction deliberately designed to deprive Shane of the brokerage fee. Shane subsequently sued Madden, Thompson and Love.

The Texas Court of Civil Appeals exonerated Thompson and Love of tortious interference with the contractual relationship between Madden and Shane. The court noted that until Thompson or Love purchased the property, Shane was not entitled to a brokerage fee. The court then held that Thompson and Love had created Shane's right to recover and that "to say that they destroyed or interfered with that which they in reality created is, of course,

illogical." *Id.* at 911. Fleck now contends that since he created the plaintiffs' right to collect the brokerage fee by entering into the June 26 agreement, he cannot at the same time be guilty of tortiously inducing a breach of contract.

We agree with the plaintiffs, however, that *Madden v. Shane* is wholly unpersuasive. First, it was the August 1979 contract between Continental and Blankenship that provided the source of the plaintiffs' right to collect a brokerage fee; the June 26 transaction between Blankenship and Fleck merely determined when an enforceable right accrued. Secondly, that Fleck's decision to enter into the June 26 contract collaterally resulted in the Brokers obtaining enforceable legal rights does not mean that Fleck could not attempt to interfere with those rights by inducing Blankenship to breach his contractual obligations to the plaintiffs. In other words, whether Fleck in fact induced Blankenship to breach the brokerage contract, and whether the Brokers as a matter of law were entitled to a fee as a result of the June 26 transaction, are separate questions. Since we are convinced that the Tennessee courts would not adopt the flawed reasoning of *Madden v. Shane*, we reject the appellant's argument.

### III.

■ Fleck's final argument is that even if he persuaded Blankenship not to pay the brokerage fee, he did not induce a breach of contract within the meaning of § 47–15–113 because Blankenship's obligation to pay the Brokers resulted from a contract implied in law rather than from an express contract. This distinction is important because § 47–15–113 does not apply to contracts implied in law. *See Mefford v. City of Dupontonia,* 49 Tenn.App. 349, 354 S.W.2d 823, 826 (1961). The district court held that the Brokers' rights stemmed from the August 1979 express contract between Blankenship and Continental.[6]

In Tennessee, an express contract is created by the parties' actual assent to mutually acceptable terms expressed in words or other suitable mode. *See Noone v. Fisher,* 45 F.Supp. 653, 655 (E.D.Tenn. 1942); *Mefford,* 354 S.W.2d at 826; *cf. Murray v. Grissim,* 40 Tenn.App. 246, 290 S.W.2d 888, 890 (1956) (contracts are usually expressed in words). Conversely, a contract implied in law is imposed by operation of law, without regard to the assent of the parties, on grounds of reason and justice. *See Paschall's Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 154 (1966); *Mefford,* 354 S.W.2d at 826.

The appellant contends that since the oral brokerage agreement contained no time limitation, the contract was terminable at the will of either party. He also asserts that Blankenship exercised the right to terminate the agreement after the January 18 transaction fell through. Thus, any duty to pay a brokerage fee because of the June 26 transaction between Blankenship and Fleck must have arisen by operation of law rather than from an express contract.

■ We do not agree that the parties' failure expressly to limit the life of the brokerage contract rendered it terminable at will. Tennessee law provides that if one or both parties to a contract have the unrestricted right to cancel or terminate the agreement, then the contract lacks mutuality and is unenforceable. *Cf. Big Cola Corp. v. World Bottling Co. Ltd.,* 134 F.2d 718, 722 (6th Cir.1943) (where one or both parties to a distributorship contract had the unrestricted right to cancel, the contract was binding only to the extent that it had already been performed); *In re Four Star Music Co., Inc.,* 2 B.R. 454, 460 (M.D.Tenn. 1979) (sales contract governed by Tennessee's version of Uniform Commercial Code). *See also J. Calamari and J. Perillo,* CONTRACTS § 4–17 at 160 (2d ed.1977).

---

6. The appellant incorrectly states the issue as whether Blankenship's obligation to pay the brokerage fee resulted from a contract implied in law or a contract implied in fact. Since the district court found that the Brokers' right

stemmed from an express contract, and since the Brokers have argued the case solely on that theory, the question of whether there was a contract implied in fact is not before the court.

Since the brokerage agreement was not specifically stated to be terminable at will, this court will not construe the contract so as to render it illusory and unenforceable. Furthermore, the district court found that in May 1980, well after the January 18 transaction fell through, Blankenship still recognized his obligations under the brokerage agreement. Having reviewed the record, we conclude that this factual finding was not clearly erroneous and that the brokerage contract remained in force at all times relevant to this litigation.

The appellant argues in the alternative that Blankenship's duty to pay the Brokers arose from a contract implied in law because Blankenship and Continental intended the brokerage agreement to facilitate a direct sale of the hotel assets rather than a sale of limited partnership interests in the hotel. Thus, the form of the June 26 transaction allegedly was not contemplated by the brokerage agreement. The appellant further argues that the terms of the sale of the limited partnership interests differed from those of the proposed sale of the hotel assets in several important respects. For instance, Fleck obtained control, but no ownership, of the hotel and Blankenship was to remain a general partner until his interest was purchased.

■ We disagree with the appellant's argument and hold that the brokerage agreement contemplated that the hotel might have to be disposed of in a manner other than a direct sale of its assets. On the basis of testimony presented at trial, the district court found:

> This change from a sale of real estate to a sale of partnership interests is a common occurrence in the field of hotel/motel sales. Indeed, testimony at trial established that such adjustments are customary and that every transaction for the sale or transfer of a hotel or motel necessarily involves some shifting of methods of sale to achieve ultimately a comfortable adaption to the particular circumstances of the seller or purchaser .... [App. at 76–77.]

The record establishes that both Blankenship and Continental were experienced in the field of hotel investment. Blankenship testified, for example, that he had owned several hotels and that corporate, limited partnership and fee simple absolute ownership forms had been used. Thus, when Blankenship and Continental entered into the brokerage agreement, they undoubtedly realized that the hotel might have to be disposed of through an arrangement other than the direct sale of hotel assets.

We are aware of testimony by Blankenship that in August 1979 he and Continental discussed a direct sale of the hotel conditioned upon obtaining Connecticut General Life Insurance Company's approval. Blankenship also testified, however:

> Q: Well, so what you're really saying is that you don't particularly care how the transaction was structured, you wanted $15,000,000. Indeed, if someone had come in and had refinancing, that would have been alright with you, wouldn't matter to Blankenship?
>
> A: No, no sir. For example, I also told him that we wouldn't take $15,000,000 in cash.
>
> Q: Well, because of tax consequences?
>
> A: That's right.
>
> Q: So, that was really what was important, tax consequences?
>
> A: Partly.
>
> Q: But if you could structure it where they take out Con General, you didn't care about Con General keeping the mortgage; you didn't?
>
> A: No; no. I didn't. [App. at 180.]

This testimony demonstrates that what was important to Blankenship was obtaining $15,000,000 for the hotel without suffering adverse tax consequences; the form of the transaction used to achieve these results was not crucial.

■ Accordingly, it is apparent that Blankenship and Continental agreed in August 1979 that the latter would be entitled to its fee if a hotel transaction were closed that both netted Blankenship approximate-

ly $15,000,000 and minimized his tax liability. The record supports the district court's conclusion that the June 26 deal between Blankenship and Fleck was such a transaction and that the Brokers were entitled to their fee. The Brokers' entitlement was based upon the express contract between Blankenship and Continental rather than upon a contract implied in law. The judgment of the district court is AFFIRMED. The appellant shall bear the costs on this appeal.

CORNELIA G. KENNEDY, Circuit Judge, dissenting.

Because I find the evidence insufficient as a matter of law to support a "clear showing" that Fleck acted maliciously to cause the breach of Blankenship's contract to pay a broker's commission to the Brokers, I dissent.

The majority does not deal with the causation portion of this requirement since Fleck in his statement of issues presented framed the question as: "Is there a 'clear showing' of malice on the part of Defendant Fleck which is required to support a judgment under Tennessee Code Annotated § 47–15–113?" Although the issue should have been more clearly stated, Fleck has in his brief argued that no malicious acts of Fleck caused Blankenship to breach the contract for the commission. I, therefore, believe that we may review whether there was anything that Fleck did with malice which induced Blankenship to breach his agreement with the Brokers.

Blankenship testified unequivocally that he did not know of any statements by Fleck to induce him to breach the contract. Rather, he believed he owed a broker's commission only if the sale was consummated according to the terms set forth in the original brokerage agreement. The District Court was not, of course, required to accept this testimony. But since it was unimpeached, the Court was required to consider it together with the other testimony in the case.

The District Court appears to have been under the impression that Fleck had some obligation to structure his offer to the purchaser so that there would be cash to pay the Brokers their commission. Under the original offer Fleck would have purchased the hotel and the members of the limited partnership which owned it would have shared pro rata in the purchase price. That sale would have provided cash from which to pay the commission. Under the restructured deal Fleck purchased 49% of the limited partners' interest and took an option to purchase the additional interests of the limited partners (but not all) and the interest of the general partner. Because the partnership had debts unrelated to the hotel property and the partnership interest had to be conveyed free of those debts, Blankenship needed what cash there was in the deal to pay those debts. The cash was further reduced by a loan Fleck had made to Blankenship. The District Court recognized that Fleck was primarily motivated by financial considerations. However, it found that "in view of the pressing circumstances surrounding Fleck in the spring of 1980 due to his own selfish need to produce the Hilton for himself and his syndicators, as well as a shortage of cash flow at the closing, Fleck clearly had an intention to cause a breach of the brokerage contract if that is what it took to close the transaction." The fact that Fleck had compelling reasons to close the deal may have given him a reason to induce Blankenship not to pay the commission. However, the Court has found that Fleck continued to offer essentially the same deal that he had always offered although for less than the entire property. To the extent that there was less cash from which Blankenship could pay the commission, it was because only 49% of the partnership's interest in the property was being purchased and because Blankenship had to pay off certain partnership debts, in order to utilize the partnership sale method rather than an outright sale of the hotel, and not because Fleck had changed the amount of his offer. It was undisputed that only 49% of the partnership interests could be purchased initially. If 50% or more were purchased the partnership would have been dissolved

and the due on sale clause triggered. There is absolutely no basis for finding that Fleck restructured his offer or offered less cash so that Blankenship would not pay the commission.

The District Court found that Fleck's agreement to indemnify the seller for a portion of the brokerage fees for which the seller might later be held liable exhibited a blatant disregard for the rights of the Brokers. The majority agrees that this evidence is probative of malice. I am at a loss to understand their logic. Fleck was buying partnership interests and the partnership of which Blankenship was general partner would be liable for the commission if Blankenship did not pay it. Blankenship agreed that he would pay the first $225,-000, the proportion of the commission which could be attributed to the sale of 49% of the partnership which was then taking place. If Fleck exercised the option to purchase the additional 24% interest of the West Side Inn Group (which he had at the time of trial), Blankenship agreed that again he would pay any commission due the Brokers for that sale. Above that Blankenship and Fleck agreed to share 50–50 any commission which might be due or become due. Since Fleck had until 1995 to exercise his option to purchase the general partner's interest and had no option to purchase the balance of the partnership nor any obligation to do so, the sharing of the obligation to pay a commission on that contingency could not encourage Blankenship not to pay the commission which the court found was due.[1] The only part of Blankenship's obligation for which Fleck agreed to indemnify Blankenship was for a possible commission on a remote future transaction which Fleck might or might not engage in. Indeed, Fleck testified that it was unlikely he would purchase the remaining 24% in the partnership since those partners wanted him to pay some tax liabilities that they would incur if they sold their partnership interests which were greater than they would have paid if the hotel had been sold.

Both the District Court and majority rely on certain statements which Fleck made as evidence of his malice and his intent that the transaction should not provide for a broker's fee. When each of these statements is examined in context, they do not establish the clear showing of malice required.

The statement by Mr. Fleck that there was no room in the deal for the Brokers was made to Mr. Burrows. Burrows, who was a friend of Fleck, went to see Fleck to see if he would do something to help the Brokers get their fee or pay the commission from his side of the deal. It was in response to that request Fleck stated that there was nothing in the deal for the Brokers. Fleck had no obligation to pay the commission nor to do anything to help the Brokers collect their commission from Blankenship. One does not cause another to breach a contract because he fails to use his efforts to get the other to perform or fails to modify his offer so that the commission can more easily be paid.

That Fleck said "f—k the brokers" and that Fleck said he would ruin the Brokers' reputations nationwide and put them out of business if they tried to delay the closing was testified to by various witnesses. First, Wilson Viar, one of the plaintiffs, testified that Martin Grusin, Blankenship's attorney in the negotiations, said that Ed Fleck made these statements. Marin Grusin then testified as to the circumstances under which the statement "f—k the brokers" was made. Grusin had arranged a meeting of all concerned partners to try to work out the deal that was ultimately consummated. Grusin wanted to wait until the Brokers (who were late) had arrived so that he would have to explain his proposal

---

1. It must be kept in mind that Blankenship was acting on behalf of the partnership when making the agreement to pay a commission. Fleck was purchasing that partnership and if a commission was due, the partnership would have to pay. It defies reason that Fleck would induce Blankenship not to pay the commission from the funds he and the old partners received and expose the partnership he was purchasing to that liability.

only once. Fleck, on the other hand, was impatient that Grusin tell him what the deal was that he proposed. It was in response to Grusin's request to delay that Fleck made his statement. The statement indicates impatience and also that Fleck was not concerned about the Brokers but not a malicious intent to have Blankenship breach his contract with them. Fleck denied having made such a statement. He testified before Grusin and was not asked about the circumstances described by Grusin.

Grusin in his testimony denied that Fleck had said that he would ruin the Brokers if they interfered with the deal. He testified that what Fleck had actually said was: "Look, brokers are not deal killers, they are deal makers. Good broker gets a representation [reputation], or if he breaks a deal, deal killer, then he won't get any business. A broker needs to have representation as a deal maker. He gets the transaction done, not one that—one that helps, not one that hinders." But if one accepts Viar's testimony and finds that Grusin was more accurate in what he told Viar than what he told the court, there is nothing that tends to show Fleck maliciously induced Blankenship to breach his contract. The Brokers did not have a right to prevent the transaction from going forward merely because they had not been paid their commission. Fleck was entitled to complete the purchase if Blankenship was willing to go forward with it. Once again, only if Fleck had some duty to help the Brokers collect their commission would he in saying the above have done anything to cause Blankenship to breach the commission contract.

The District Court made no specific finding as to the manner in which Fleck caused Blankenship to breach his agreement to pay the Brokers a commission. A careful review of the record discloses nothing.

Because the record contains no evidence that Fleck maliciously caused Blankenship to breach the contract, I would reverse.