**William A. WARDE,**
**Plaintiff–Appellant,**

v.

**Kermit KAISER, et al.,**
**Defendants–Appellees.**

**No. 87–6169.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 4, 1989.

Decided and Filed Oct. 6, 1989.

Ira M. Thomas, Al Thomas, argued, Thomas and Thomas, Memphis, Tenn., for plaintiff-appellant.

Dewitt W. Shy, Jr., argued, Nathan A. Bicks, Memphis, Tenn., for defendants-appellees.

* The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

Before KENNEDY and NELSON, Circuit Judges, and WILHOIT, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a diversity case, governed by Tennessee law, in which the plaintiff's complaint was framed on the theory that the defendants had wrongfully induced the "breach" of certain insurance contracts. No breach of contract had in fact occurred, as the plaintiff admitted in deposition testimony, and the district court granted summary judgment for the defendant on that basis.

After filing a notice of appeal, the plaintiff moved the district court for leave to amend his complaint by adding a claim for "tortious interference with prospective contractual relations or prospective economic advantage." The district court denied the motion on the ground that it no longer had jurisdiction. The plaintiff then moved this court to allow the amendment.

The attempt to amend comes very late in the day, and we would be reluctant to permit such an amendment in the absence of a compelling demonstration that the interests of justice require it. No such demonstration is possible here, for allowance of the amendment would avail the plaintiff nothing. We are satisfied that under the facts set forth by the plaintiff, Tennessee law would not allow a recovery on either the new theory or the old one. The plaintiff's motion will be denied, and the judgment of the district court will be affirmed.

I

Plaintiff William A. Warde, a Florida insurance agent, was a longtime friend of Mr. and Mrs. Jack Shannon. Mr. Shannon, a resident of Tennessee, died in March of 1985. Some weeks later Mr. Warde spoke with Mrs. Shannon and her brother, a lawyer, about Mrs. Shannon's purchasing a substantial amount of life insurance to cover the estate taxes that might be due on her death. Mrs. Shannon was interested,

and Mr. Warde eventually obtained coverage for her in the amount of $4 million from Midland Mutual Insurance Company.

After discussions with Mrs. Shannon's accountant and other financial advisors, it was decided that the Shannons' three adult children ought to be the owners and beneficiaries of the insurance. Applications from the children were duly accepted, and on September 5, 1985, Mr. Warde delivered to Mrs. Shannon's accountant three new Midland Mutual policies designating the children as owner/beneficiaries and insuring Mrs. Shannon's life for a total of $4 million. The initial premiums (approximately $108,-000) paid on the original coverage were treated as payments on the children's policies, and the original policies were surrendered.

Each of the Midland Mutual policies contaned a "free look" provision reading as follows:

**"Notice to the Owner—20–day right to examine policy**

You have 20 days from the date you receive this policy to decide if it meets your needs. If you are not fully satisfied with it, return it to us within that time. Mail or deliver it to our Home Office or to the agent through whom you bought it. We will then treat the policy as if it had never been issued and return any premium paid."

Notwithstanding that Mrs. Shannon had already received one such free look, Mr. Warde has stipulated that the children were entitled to take a free look of their own. Mr. Warde has also acknowledged, both in his complaint and in his brief on appeal, that on September 5, 1989, the accountant mentioned to him that other companies had made "lower offers" that were being considered.

One of the offers of which the accountant spoke proved to have come from defendants Kermit Kaiser, Sr. and Kermit Kaiser, Jr., Tennessee insurance agents who represented defendant Equitable Life Assurance Society. The younger Mr. Kaiser is a friend of one of the Shannon children.

On September 17, 1985—within the 20–day free look period—Mr. Warde received a letter from the Shannons' accountant returning the Midland Mutual policies and requesting a refund of the premium. This rescission of the Midland Mutual policies presumably cost Mr. Warde the commissions he had expected to receive, and in April of 1986 he filed suit against The Equitable and the rival insurance agents. Midland Mutual did not join in the action as a party.

Mr. Warde's complaint contained a recitation of facts that concluded with a reference to Chapter 07801–24 of the Rules of the Tennessee Department of Insurance. That chapter implements Tenn.Code Ann. § 56–8–104(11), subsection (A) of which declares the following conduct to be a prohibited act or practice:

"In the case of a life insurance agent, failing to give notice to an applicant for life insurance of the adverse consequences which may result from surrendering an existing life insurance policy prior to the determination of insurability by the replacing insurer. The notice shall be in the form prescribed by the commissioner and receipt of such notice shall be acknowledged by signature of the applicant. A copy of the signed notice shall be provided to the existing insurer in accordance with rules adopted by the commissioner."

The complaint does not allege that the Midland Mutual policies were surrendered prior to the determination of insurability by The Equitable. On the contrary, Mr. Warde's brief tells us that "while he was putting together his proposal, young Kaiser made sure to *stress* to Mr. Shannon that his mother should 'not drop the Midland policy until you have [the] replacement in hand.'" (Emphasis in original.) It is fair to assume that no written notice was given, however, and the complaint avers that no copy of such a notice was received by Midland Mutual.

Section 0780–1–24–.05 of the regulations says that each insurance agent who initiates an application for replacement life insurance must present to the applicant a prescribed "Notice Regarding Replacement" not later than the time of taking the

application. A copy of the notice is to be submitted to the replacing insurer, and § 0780–1–24–.07 provides that the replacing insurance company is to notify the existing insurer within five days of the receipt of the application. The regulations provide that any insurer or agent failing to comply with these requirements "shall be subject to such penalties as may be appropriate under the Insurance Laws."

Following its recitation of the facts, Mr. Warde's complaint set forth two separate counts. Count One alleged that the defendants were "guilty of the Tennessee common law tort of inducement of the breach of a contract." The offended contracting party was identified as The Midland Mutual Life Insurance Company, and the complaint charged the defendants with procuring the breach "maliciously . . . by surreptitiously, willfully, and intentionally not following the statutory laws of the State of Tennessee and the rules and regulations promulgated by the Department of Commerce and Insurance thereunder."

The second count was substantially identical to the first, except that it alleged a violation of Tenn.Code Ann. § 47–50–109. That statute (formerly Tenn.Code Ann. § 47–15–113) provides as follows:

"It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract; and the party injured by such breach may bring his suit for the breach and for such damages."

The complaint concluded with a prayer for compensatory damages in the amount of $149,000, common law punitive damages in the amount of $1,000,000, and statutory treble damages in the amount of $447,000.

In April of 1987—more than a year after the filing of the complaint—the defendants moved for summary judgment on the basis of the pleadings and certain deposition testimony and other discovery material. On October 2, 1987, the district court (Robert M. McRae, J.) entered an order granting summary judgment in favor of the defendants.

The order pointed out that although the plaintiff was suing the defendants for inducing the "breach" of a contract with Midland Mutual,

"[t]he plaintiff has conceded . . . that neither Mrs. Shannon nor her children, the owners of the two sets of policies, breached the insurance contracts. Instead, the plaintiff has asserted that his causes of action will lie because the defendants, in issuing replacement policies to Mrs. Shannon's children, failed to comply with regulations imposed upon insurance agents by the Department of Commerce and Insurance of the State of Tennessee."

The court went on to hold that the plaintiff was not entitled to prevail on either of the claims pleaded in his complaint:

"Because the plaintiff's claims are founded entirely on causes of action which require a showing of a breach of contract, and because the plaintiff has made no such showing, an essential element of his case is not present. Where a non-moving party has failed to make a sufficient showing on an essential element of his case, Rule 56 mandates that a moving party is entitled to judgment as a matter of law."

Plaintiff Warde filed a timely notice of appeal without ever having sought leave to amend his complaint. Subsequent to the appeal, as noted above, he filed a motion in the district court seeking leave to amend the complaint so as to charge the defendants with tortious interference with prospective contractual or other advantageous business relations. A notice of appeal already having been filed, the district court denied the motion for want of jurisdiction to entertain it. Mr. Warde then filed a motion asking this court either to permit the amendment or to grant the district court jurisdiction to hear the motion to amend.

## II

■ The statutory treble damage remedy for inducement of a breach of contract represents an extreme penalty, and the Tennessee courts have said that the statute "should not be enforced except upon a clear showing that its terms have been violated." *Emmco Insurance Co. v. Beacon Mutual Indemnity Co.*, 204 Tenn. 540, 549–50, 322 S.W.2d 226, 230–31 (1959), quoting *Lichter v. Fulcher*, 22 Tenn.App. 670, 125 S.W.2d 501, 508 (1938). Before there can be a recovery under the statute, each of the following seven conditions must be met:

"1. There must be a legal contract.

2. The wrongdoer must have known of the existence of the contract;

3. The wrongdoer must have intended to induce its breach;

4. The wrongdoer must have acted maliciously;

5. The contract must have been breached;

6. The act complained of must have been the proximate cause of the breach; and

7. Damages must have resulted from the breach."

*Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn.App.1975). See also *Edwards v. Traveler's Insurance of Hartford, Conn.*, 563 F.2d 105, 120 (6th Cir.1977), and *Continental Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 229 (6th Cir.1984), quoting the seven conditions and indicating that they apply to claims under the common law as well as to claims under the statute.

It was stipulated during Mr. Warde's deposition that the Midland Mutual policies were returned within the 20–day free look period. Mr. Warde testified unequivocally, moreover, that he was not contending that the policy owners had committed any breach of their contractual obligations. This clearly rules out any possibility of recovery under Tenn.Code Ann. § 47–50–109; the caselaw teaches that there "must" have been a breach of contract, and here there simply was no breach.

As to the common law claim, Mr. Warde acknowledges that the claim was not artfully pleaded. Citing the Restatement of Torts and the treatise on torts by Dean Prosser and Professor Keeton, however, Mr. Warde argues in effect that under general common law principles it may be tortious for a person acting in pursuit of some improper purpose to interfere intentionally with prospective or potential contractual relations of an advantageous nature; that the complaint alleged an apparent violation by the Kaisers of the Tennessee insurance laws and regulations; that this should have put the defendants on notice that they were being charged with wrongful interference with the Midland Mutual contracts, for which contracts Mr. Warde would have earned substantial commissions had the insurance been continued in force; and that if the complaint is deficient in its present form, the interests of justice would be served by allowing the relatively minor amendment that has now been tendered.

There are several potential problems with Mr. Warde's argument. It is far from clear, for one thing, that a complaint charging inducement of the breach of a contract may properly be read as charging wrongful interference with a business relationship the severance of which involved no breach of contract at all. See *Mefford v. City of Dupontonia*, 49 Tenn.App. 349, 354 S.W.2d 823 (1961) (complainant who did not sue specifically on the grounds of interference with business relationships could not proceed on this principle in his appeal). It is hard to understand why Mr. Warde did not seek permission to amend his complaint while the district court still had jurisdiction to allow an amendment—jurisdiction that would have existed even after the entry of judgment. Generally speaking, at least, "motions for leave to amend pleadings are not properly raised in the first instance at the appellate stage." *Scott v. Schmidt*, 773 F.2d 160, 163 (7th Cir.1985).

■ More importantly, as we see it, Mr. Warde could not have recovered damages from the defendants in this case even if his complaint had asserted from the outset a

claim for tortious interference with prospective contractual relations or prospective economic advantage. The Supreme Court of Tennessee has held that an insurance agent has no standing to maintain a tort action against a competing agent for pirating a piece of insurance business even where it can be assumed that a breach of contract was involved. *Willard v. Clayborn*, 220 Tenn. 501, 419 S.W.2d 168 (1967). *A fortiori*, it would seem, the disappointed agent has no standing where it is established that no breach of contract occurred.

The insurance contract sold by the plaintiff agents in *Willard v. Clayborn* was not intended to operate for the plaintiffs' benefit, even though the plaintiffs would receive a commission on the sale, and the plaintiffs were not parties to the contract. Under these circumstances, the Tennessee court held, the defendant agent and the company that issued the replacement policy owed no duty to the plaintiff agents. In the case at bar, similarly, there is no reason to suppose that the Midland Mutual insurance policies were intended to operate for the benefit of Plaintiff Warde. Neither was Mr. Warde a party to the policies. Under the logic of *Willard v. Clayborn*, then, the defendants owed no duty to Mr. Warde, and the latter has no standing to sue.

This conclusion is buttressed by the secondary authorities on which Mr. Warde relies for the proposition that no breach of contract need be shown. It is true that the Restatement says that "[o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation...." Restatement (Second) of Torts § 766B (1979). It is also true that according to *Prosser and Keeton on Torts* (5th ed. 1984) the weight of authority holds that wrongful interference with contracts terminable at will is actionable. *Id.* at 995–96. But noting that "[t]he policy of the common law has always been in favor of free competition," *id.* at 1012, Prosser and Keeton say there is "no doubt" that a competitor *may* interfere for the purpose of acquiring the business for himself:

> "Where the contract interfered with is terminable at will ... the privilege of competition has been recognized. In such a case there is no contract right to have the relation continued, but only an expectancy, which is similar to the expectancy of a business that a customer will continue to do business with it. *With such an expectancy of future relations, and prospective advantage, there has been no doubt that a competitor has the privilege of interfering to acquire the business for himself.*" (Emphasis supplied.)

*Id.* at 987. Similarly, § 768(1) of the Restatement has this to say on the subject:

> "One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other."

■ Even if the defendant agents committed a technical violation of Tenn.Code. Ann. § 56–8–104(11) and its implementing regulations by failing to give the Shannons the prescribed "Notice Regarding Replacement," nothing in Tennessee's insurance laws purports to make such a failure actionable at the instance of a competing insurance agent. The defendant agent stressed to the Shannons that the Midland Mutual coverage should not be dropped until The Equitable had actually issued replacement coverage, and whatever position the Tennessee courts may take on "wrongful interference" entailing no breach of

contract,[1] we do not believe that the Tennessee courts would treat the Shannons' rescission of the Midland Mutual coverage as having been procured through "wrongful means."

The principal purpose of Tenn.Code Ann. § 56–8–104(11) is, after all, to see that life insurance applicants are warned that they may find it costly to cancel an existing coverage in anticipation of getting replacement coverage if the cancellation occurs prior to a determination of insurability by the replacing insurer. Thus the form of notice prescribed in the implementing regulations says, in bold print, "IF YOU SHOULD FAIL TO QUALIFY FOR THE LIFE INSURANCE FOR WHICH YOU HAVE APPLIED, YOU MAY FIND YOURSELF UNABLE TO PURCHASE OTHER LIFE INSURANCE OR ABLE TO PURCHASE IT ONLY AT *SUBSTANTIALLY* HIGHER RATES." (Emphasis in original.) The obvious purpose is to warn the insured against canceling a coverage that turns out not to be replaceable, or replaceable only at higher rates; the purpose is not to protect the insurance agent against cancellation of a coverage sold by him in favor of a coverage available through another agent at a lower price.

Prosser and Keeton may be somewhat wide of the mark in saying that the policy of the common law has "always" been in favor of free competition,[2] but our modern jurisprudence, at least, does generally seek to protect the advantages accruing to consumers from free competition and economic efficiency. The price of insurance is important to the consumer, as the Tennessee Department of Insurance recognized in framing the form of notice quoted above, and it is unlikely, in our view, that the courts of Tennessee would wish to see the insurance buyers of that state paying higher prices than necessary because of judicial decisions tending to discourage price competition among sellers of insurance.

Mr. Warde argues that if the Kaisers had given the Shannons the prescribed notice regarding replacement, and if The Equitable had provided notice to Midland Mutual, the latter company might have been induced to meet or beat the price of The Equitable's coverage. We are not persuaded.

Mr. Warde had actual knowledge, on September 5, 1989, that lower offers were under consideration, and he had every reason to suppose, when the Midland Mutual policies were returned to him twelve days later, that the Shannons had decided to accept a more favorable offer. A replacement policy issued by The Equitable or any other company writing life insurance in Tennessee would have had to contain its own 20–day free look provision. See Tenn. Code Ann. § 56–8–104(11)(A), making it a prohibited practice, with respect to any replacement transaction, not to provide "an unconditional refund offer of at least twenty (20) days from the date of delivery of the policy." If Mr. Warde could get a better price from Midland Mutual (or even if he could not), there was nothing to prevent him from trying to persuade the Shannons to rescind the Equitable policies and

---

1. The plaintiff has cited no Tennessee case in which recovery was allowed for wrongful interference not involving a breach of contract, and it appears that Tennessee has not developed any significant body of law in this area. *Cesnik v. Chrysler Corp.*, 490 F.Supp. 859, 874 (M.D.Tenn. 1980). *Cf. Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 485 (Tenn.App.1978) (defendant entitled to summary judgment on claim for intentional interference with prospective advantage where plaintiff "has cited no authority in support of this cause of action, nor even any to show that such a tort is recognized in Tennessee"), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979). As we previously mentioned, *Edwards v. Travelers Insurance*, 563 F.2d 105, 120 and *Continental Motel Brokers v. Blankenship*, 739 F.2d 226, 229, both seem to say that Tennessee law always requires a breach of contract, even if the plaintiff is not relying on Tenn.Rev.Code § 47–50–109. For purposes of analysis, however, we shall assume here, without so deciding, that Tennessee would follow the general law as summarized in Prosser and Keeton and in the Restatement.

2. As Prosser and Keeton point out at page 980 of their treatise, the English law that developed with the advent of the severe labor shortages caused by the Black Death in the middle ages was designed to prevent laborers from jumping ship for higher wages. Traces of this sort of anti-competitive thinking certainly can be discerned in caselaw from subsequent centuries.

return to the Midland Mutual fold. It is not the defendants' fault that he failed to do so.

There is a problem with the way in which Mr. Warde's case was pleaded, no doubt, but however it might have been pleaded, the fundamental problem with the plaintiff's case is that there is no case there. The motion to amend is DENIED, and the judgment of the district court is AFFIRMED.